UNITED STATES of America

v.

Tyrone SMITH, Appellant.

UNITED STATES of America

v.

Anthony E. GARTRELL, Appellant.

Nos. 75–1920, 75–1941.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 1, 1976.

Decided Dec. 17, 1976.

---

court) and Timothy J. Hmielewski * were on the brief for appellants.

Alexia Morrison, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before WRIGHT, McGOWAN and TAMM, Circuit Judges.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

On November 11, 1974, the Seventh Street branch of the National Bank of Washington was robbed by two armed men who wore hats completely covering their hair, but employed no other form of disguise. The bandits disarmed the bank's private security guard immediately upon entering the bank lobby. While one stood watch, the other proceeded through the bank manager's office into the tellers' cage area, where he filled a brown paper bag with bills of various denominations. The entire incident consumed less than five minutes. A subsequent audit revealed that the robbers fled with $13,214 in cash, as well as the bank guard's revolver.

Under an indictment filed in the District Court on February 12, 1975, appellants were convicted by a jury of armed bank robbery (18 U.S.C. § 2113(a) (1970)) and armed robbery (of the gun; 22 D.C.Code §§ 2901, 3202 (1973)). On appeal both appellants claim to have been denied effective assistance of counsel. Appellant Gartrell asserts further that his conviction should be overturned because the trial judge ruled that a prior attempted robbery conviction could be used to impeach him if he chose to testify. We find appellants' contentions unpersuasive with respect to ineffective assistance of counsel, but we think that the trial court must reexamine the ruling challenged by Gartrell. Accordingly, the conviction of

Karl Fryzel * with whom Michael E. Geltner, Washington, D. C. (appointed by this

* Entered an appearance as Student Counsel pursuant to Rule 20 of the General Rules of this court.

Smith is affirmed, and the case is remanded as to Gartrell for further proceedings of the nature hereinafter described.

I

Appellants maintain that they were deprived of effective legal representation through trial counsel's failure to move to suppress their in-court identifications by three government witnesses. These identifications, so it is said, were constitutionally suspect because they followed in the wake of suggestive pre-trial investigation procedures. In particular, appellants object to the fact that local police and a Federal Bureau of Investigation agent displayed certain photographs to the Government's identification witnesses during the pretrial period.

On the day after the crime, and again on the day of appellants' trial, surveillance film pictures taken by bank cameras while the robbery was in progress were shown to all three identification witnesses—the private security guard, the Seventh Street branch manager, and a teller.[1] Prior to appellants' arrest, the same three individuals also viewed several arrays of photographs from police files, and identified from among them appellant Smith or appellant Gartrell or both.[2]

■ Appellants contend that exhibition of the bank surveillance pictures was im-

1. The bank manager, Efton Dudley, also viewed these pictures on two other occasions before trial, once in December, 1974 and once in January, 1975. Tr. 134.

2. The information available from the trial record on this score is as follows:

Nov. 11, 1974—Robbery at Seventh Street branch.

Nov. 13, 1974—Mary Roach, teller, identified Smith from array of five to eight photographs (in some of which the subject wore a hat). Tr. 87–88, 100–01, 103–04, 113 (cross examination).

Late Nov. or early Dec. 1974—Mary Roach identified Gartrell from array of three photographs (in none of which the subject wore a hat). Tr. 102–03, 113–15 (cross examination).

Dec. 13, 1974—(a) Police received information from a confidential source indicating that Smith was one of the men responsible for the robbery.

(b) Confidential source viewed the bank surveillance photographs and identified one of the subjects as Smith. Kaclik affidavit.

Dec. 16, 1974—Officer McGill viewed the bank surveillance photographs and identified one of the subjects as Smith. Kaclik affidavit.

Dec. 18, 1974—Efton Dudley, Seventh Street branch manager, and Mary Roach identified Smith from an array of eight photographs displayed by Officer Kaclik and Detective Stanford. Tr. 151–52, 158 (direct and cross-examination of Officer Kaclik); Kaclik affidavit. Tr. 136–37 (cross-examination of Mr. Dudley). Efton Dudley testified on both direct and cross-examination that he identified both Smith and Gartrell from the array displayed by Officer Kaclik. However, Officer Kaclik testified that Mr. Dudley only identified Smith, and furthermore that Gartrell's picture was not included in the array shown on December 18. Tr. 125, 135–36, 158, 160.

Romaine Missouri, bank guard, also viewed the array of photographs on December 18, but apparently identified no one. Tr. 152–53, 158. Romaine Missouri herself testified that she viewed no arrays of photographs prior to January 14. Tr. 43.

Dec. 19, 1974—Warrant issued for the arrest of appellant Smith.

Jan. 14, 1975—(a) Police received information from a source indicating that Gartrell was the armed man who had stood watch in the bank lobby during the robbery. Fontana affidavit.

(b) Romaine Missouri identified Gartrell from an array of nine photographs displayed by Officer C. Fontana. (In none of these photographs did the subject wear a hat.) Tr. 25–26, 50–51, 163–64; Fontana affidavit.

(c) Arrest of Smith.

Jan. 15, 1975—(a) Warrant issued for the arrest of Gartrell.

(b) Arrest of Gartrell.

Jan. 23, 1975—Lineup at Metropolitan Police Department.

(a) Mary Roach identified both Smith and Gartrell.

(b) Romaine Missouri identified only Gartrell.

(c) Efton Dudley identified Smith and a second individual (not Gartrell) whose identity is not disclosed by the record. Gov. Exh. 5, 10, 12, 13.

In addition to the events outlined above, Officer Kaclik testified that he showed photo arrays (to government witnesses) on three occasions pri-

proper because likely to result in retention of the image observed therein, rather than recall of the persons actually seen on the day of the robbery. With respect to the police photo arrays, appellants voice at least two complaints: first, that in some instances the arrays were displayed so long after the robbery as to be inherently suggestive, and thus to cast doubt on all subsequent identifications by the viewers; and second, that in any event the arrays were unnecessary since the police had probable cause to arrest appellants even without photo identification by the government witnesses, and therefore could have resorted directly to the presumably more reliable lineup procedure. In light of this allegedly objectionable official behavior, appellants claim that trial counsel were duty-bound to move to suppress the subsequent testimony of government identification witnesses. Their failure to make such motion, in appellants' view, constitutes grounds for reversal and a new trial. We disagree.

Appellants have not demonstrated that their representation by trial counsel was inadequate. In *U. S. v. DeCoster*, 159 U.S.

App.D.C. 326, 487 F.2d 1197, 1202 (D.C.Cir. 1973), this court held that "a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate." [3] This court thus departed from the older, more restrictive standard under which parties claiming ineffective assistance of counsel were required to show that counsel's performance had reduced the proceedings to a "farce and a mockery of justice." [4] *Diggs v. Welch*, 80 U.S.App.D.C. 5, 148 F.2d 667, 670 (1945). *See also Jones v. Huff*, 80 U.S.App.D.C. 254, 152 F.2d 14 (1945). However, even under the more recent approach, with its correspondingly higher standards of acceptable advocacy, the conduct of the defense attorneys in this case was unobjectionable.

Both defense attorneys were aware from the outset that the Government had obtained pretrial photographic identifications from witnesses who were expected to identify defendants in court and to recount the circumstances of their earlier identifications of the same individuals. The trial transcript strongly suggests that the prosecutor allowed both defense lawyers and appellant

or to December 18, but that no identifications were made on those occasions. None of the arrays exhibited by Officer Kaclik before December 18 included photographs of either Smith or Gartrell. Tr. 152, 161.

Finally, during direct examination, Mary Roach testified that, on an unspecified date, she selected photographs of both Smith and Gartrell from an array displayed by an "agent of the FBI or the Metropolitan Police Department." Tr. 68. It is unclear whether this testimony refers to an array not mentioned elsewhere in the trial transcript, or whether, on direct examination, Mrs. Roach simply merged two or more of the photographic displays described separately in her own cross-examination and in the testimony of other witnesses.

3. Other circuits have adopted similar positions. *See, e. g., United States ex rel. Green v. Rundle*, 434 F.2d 1112 (3d Cir. 1970); *MacKenna v. Ellis*, 280 F.2d 592 (5th Cir. 1960), *modified en banc*, 289 F.2d 928, *cert. denied*, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961); *Herring v. Estelle*, 491 F.2d 125 (5th Cir. 1974) (attempting to reconcile the reasonably effective assistance test and the farce-mockery test); *Beasley v. United States*, 491 F.2d 687 (5th Cir. 1974); *United States ex rel. Williams v. Twomey*, 510 F.2d 634 (7th Cir.), *cert. denied*, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1974) (reviewing

recent modifications in the law of other circuits, but finding it unnecessary to abandon the "mockery of justice" test).

4. This criterion was first evolved in the collateral attack context of habeas corpus petitions. For the historical development of the "reasonable competence" norm in this circuit, with discussion of the direct appeal-collateral attack distinction, *see*, in addition to *DeCoster, supra*, *United States v. Butler*, 164 U.S.App.D.C. 151, 504 F.2d 220 (1974); *Scott v. United States*, 138 U.S.App.D.C. 339, 427 F.2d 609 (1970); *United States v. Hammonds*, 425 F.2d 597, 138 U.S.App.D.C. 166 (1970); *and Bruce v. United States*, 126 U.S.App.D.C. 336, 379 F.2d 113 (1967).

For a recent habeas case in another circuit which continued to apply the "farce and mockery" standard, *see United States ex rel. Marcelin v. Mancusi*, 462 F.2d 36 (2d Cir. 1972), *cert. denied*, 410 U.S. 917, 93 S.Ct. 997, 35 L.Ed.2d 279 (1973), *citing United States v. Wight*, 176 F.2d 376 (2d Cir. 1949), *cert. denied*, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950) (involving motion to vacate and correct sentence under 28 U.S.C. § 2255 rather than petition for writ of habeas corpus).

Smith to view all the photographs previously displayed to the various witnesses.[5] Appellants do not now claim that defense counsel were denied such an opportunity. Appellant Gartrell, while apparently not shown all of the "mug shots" exhibited by police, did see a number of these photos which were supplied to his attorney by the prosecutor.

Not only do the defense trial attorneys in this case appear to have been fully apprised of the photo array details, but they were also familiar with the applicable law concerning such pretrial identification techniques. Both expressed satisfaction that, while the weight and credibility of the iden-

tification evidence might be subject to dispute, the constitutionality of the procedures followed in obtaining such evidence was beyond question. The fact that a pretrial photo "spread" can be appropriate under recent controlling Supreme Court decisions was explicitly acknowledged by defense counsel. Appellant Gartrell's attorney stated that he knew of "no improprieties . . . which would necessitate a suppression hearing," and appellant Smith's attorney concurred.[6]

Counsel's failure to move to suppress was thus the product of deliberate and informed decision, not oversight or inadvertence.[7] As an appellate court, remote

5. In a bench conference before the presentation of evidence, defense counsel acknowledged that "*a pretrial photo spread*" had taken place. Tr. 4–5 (emphasis added). Although use of the singular article was inaccurate, we believe this is an extraordinarily slender reed on which to base appellants' theory that counsel was uninformed with respect to the photo arrays. In the course of the bench conference, the Assistant United States Attorney assigned to the case commented that "[a]ll counsel are fully aware of the circumstances" of the pre-trial identifications. Tr. 4. Neither defense lawyer challenged this statement at the time it was made or at any stage of the trial proceedings.

6. Trial counsel's thorough acquaintance with the circumstances of the pretrial identifications and obvious consideration of their acceptability under prevailing law serve to distinguish this case from *Saltys v. Adams*, 465 F.2d 1023 (2d Cir. 1972), upon which appellants rely heavily. In addition, a more telling dissimilarity separates the two appeals. In *Saltys*, the Second Circuit *did* criticize defense counsel's failure to object to certain identification testimony. However, the court's conviction that an objection should have been raised at trial did not stem primarily from an impression that the subject testimony was the product of suggestive photo displays. Rather, the court believed that, under the interpretation of *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), prevailing at the time of trial (and later discredited in *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)), the absence of a defense lawyer at prearraignment corporeal identifications rendered such identifications automatically excludable at a subsequent criminal trial. As convincingly noted in Judge Friendly's dissent, the majority opinion provides no indication of any improper suggestion in the photo arrays shown by police in *Saltys*.

7. The Government expends considerable energy in an attempt to bring this case under the umbrella of *Henry v. Mississippi*, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), and *Nelson v. California*, 346 F.2d 73 (9th Cir.), *cert. denied*, 382 U.S. 964, 86 S.Ct. 452, 15 L.Ed.2d 367 (1965). *See* Brief for Appellee at 10–13. Arguably, however, counsel's decision here did not involve the sort of strategic choice envisioned by the Supreme Court in *Henry*, and actually confronted by the Ninth Circuit in *Nelson*. In the former case, Justice Brennan's majority opinion enumerated two possible explanations for counsel's omission of a potential trial tactic, and plainly implied that a criminal defendant could not successfully maintain an ineffective assistance claim on the ground that counsel had purposefully eschewed one of several reasonable and mutually exclusive litigation alternatives in favor of another. Relying upon the Supreme Court's language in *Henry*, the Ninth Circuit held in *Nelson* that appellant had received satisfactory legal representation, despite trial counsel's failure to challenge the constitutionality of an incriminating search of appellant's apartment. (The *Nelson* precedent is perhaps rendered even more impressive by the fact that, for purposes of the appeal, the court accepted as true appellant's assertions that he had "disagreed with and objected to counsel's strategy" at trial.) The court's opinion stressed two factors: first, that defense counsel was "quite reasonable" in his judgment that the proposed Fourth Amendment point was not likely to be sustained; and second, that

counsel had objected, on the ground of immateriality, to an inquiry which would have a bearing on the question of probable cause, and that, if probable cause had been made an issue, additional testimony, probably quite harmful to [defendant], might have been admitted, whereas, by objecting as he did, [de-

from the trial arena, we are reluctant to second-guess the considered judgments of experienced trial counsel. Particularly is this so when such judgments appear sound, even after evaluation by a tribunal enjoying the benefits of hindsight and time for reflection. Here, nothing in the record convinces us that the pretrial photo identifications violated the due process standard elaborated by the Supreme Court in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).[8] Under these circumstances, we perceive no reason why conscientious advocacy should require the futile formality of a suppression hearing.

In *Simmons*, the Court recognized the widespread use of photo exhibits in criminal law enforcement, and declined the opportunity to promulgate general rules governing such identification techniques. Rather, the Court held that "each case must be considered on its own facts," and that pretrial photographic displays would not warrant reversal of a criminal conviction unless the procedures employed were "so impermissi-

bly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971.[9] If anything, the photo identifications upheld under the newly-announced standard in *Simmons* were more suggestive than those criticized by appellants here.

The underlying events in *Simmons* were very similar to those in the case currently before us. Two armed men robbed a savings and loan association in midafternoon on a business day. They wore no masks. In the course of their investigation of this incident, FBI agents obtained a series of at least six snapshots from a sister of the man suspected of having driven the robbers' getaway car. The set of snapshots consisted primarily of group photographs. Petitioner Simmons appeared in several, if not all,[10] of the photos. Five bank employees, each of whom had had ample occasion to observe the bandits, viewed the series of snapshots on the day after the crime. Each witness was alone when he or she examined the photographs, and each witness independently identified Simmons as one of the

---

fendant's] counsel succeeded in having it excluded.

346 F.2d at 76.

In the case at bar, we are admittedly hardpressed to imagine any comparable strategic reason (other than avoidance of unnecessary delay and maintenance of amicable relations with the trial judge) for trial counsel's failure to contest the admissibility of identification testimony by the government witnesses. But we find such strategic justification superfluous when a given trial tactic is virtually certain to prove unavailing. *See* text accompanying notes 8 and 12 infra. Counsel is not obliged to make every conceivable motion in the faint hope that one may succeed. *See Harried v. United States*, 128 U.S.App.D.C. 330, 389 F.2d 281, 286 (1967).

8. Appellants cite two post-*Simmons* decisions in this circuit in which criminal convictions were overturned due to serious flaws in pretrial identification procedures. *See United States v. Sanders*, 156 U.S.App.D.C. 210, 479 F.2d 1193 (1973); *Mason v. United States*, 134 U.S.App. D.C. 280, 414 F.2d 1176 (1969). *See also United States v. Washington*, 292 F.Supp. 284 (D.D. C.1968) (identification evidence suppressed). These cases all involved factual patterns easily distinguishable from that now before us, and are clearly not dispositive on the matter of the

propriety of the photo displays here attacked. Indeed, appellants' insistence to the contrary notwithstanding, both this court and other circuits have found the *Simmons* due process standard satisfied by photo identification techniques at least arguably more suggestive than those used in this case. *See, e. g., Sutton v. United States*, 140 U.S.App.D.C. 188, 434 F.2d 462 (1970), *cert. denied*, 402 U.S. 988, 91 S.Ct. 1676, 29 L.Ed.2d 153 (1971); *Mysholowsky v. New York*, 535 F.2d 194 (2d Cir. 1976); *Smith v. Estelle*, 531 F.2d 260 (5th Cir. 1976).

9. *See also Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *and Neil v. Biggers*, 409 U.S. 188, 196–201, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

10. This uncertainty in *Simmons* stems from the following facts:

(i) None of the photographs were introduced at trial by the Government.

(ii) The defense did not seek discovery of the photographs, as it might have under Fed. R.Crim.P. 16(a)(1)(C).

(iii) A defense request that the photographs be produced at trial pursuant to the Jencks Act, 18 U.S.C. § 3500 (1970), was denied, and the denial was affirmed by the Supreme Court.

robbers.[11] At trial the Government solicited only in-court identifications from these witnesses, and made no direct reference to the pretrial snapshot displays. Despite the small number of photos shown to the witnesses, and despite the recurring appearance of Simmons in those photos, the Supreme Court found neither a due process violation nor a need to reverse as an exercise of its supervisory authority over the lower federal courts.[12]

In light of the *Simmons* result, we are unable to discern any fatal flaw in the identification procedures followed in the matter now at hand and made known to defense counsel in advance of trial.[13] The

11. At a later date, but still prior to trial, the five witnesses were shown "indeterminate numbers of pictures" by the FBI, and again, each witness selected a photo of Simmons.

12. Four years later, the Supreme Court extended *Simmons* to include not only in-court identifications following contested pretrial procedures, but also testimony concerning pretrial identifications themselves. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Justice Powell's majority opinion stated that the primary evil to be avoided is "a very substantial likelihood of irreparable misidentification." . . . While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of "irreparable" it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process . . . .
409 U.S. at 198, 93 S.Ct. at 381.

13. This is not to say that we view those procedures as ideal, any more than did the Supreme Court in *Simmons*. *See* 390 U.S. at 386 n. 6, 88 S.Ct. 967. Though we are mindful of the utility of photo displays in modern urban criminal investigations, we recognize also the dangers inherent in all eyewitness identifications. Routine precautionary measures can minimize the additional potential for error created when eyewitness testimony is preceded by viewings of photo arrays:
(1) The number of photos shown should be large enough to present a fair test of the witness's ability to make an identification. One commentator reports that
n England, the usual number is eight or ten, and this number may be the minimum required by police regulations. English judges have been known to comment unfavorably, when summing up to the jury, upon the showing of merely six. In Paris, the number shown ranges from fifteen to twenty.
P. Wall, *Eye-Witness Identification in Criminal Cases* 77 (1965) (footnotes omitted).
(2) The record indicates that Mary Roach had selected appellant Smith's photo from an array shown to her on November 13, 1974. In addition, on December 13, 1974, a confidential source viewed the bank surveillance pictures and identified appellant Smith as one of the robbers. Most significantly, on December 16, Officer McGill, familiar with appellant Smith from prior encounters, examined the bank surveillance photographs, and identified one of the gunmen as Smith. Taken together with the earlier photo identifications by the bank teller and the informant, Officer McGill's statement furnished adequate justification for an arrest and subsequent lineup. Under these circumstances, the police might well have dispensed with further photo displays involving appellant Smith. *See* in this connection Model Code of Pre-Arraignment Procedure § 160.2 (Proposed Official Draft, 1975). *See also Simmons, supra*, 390 U.S. at 386 n. 6, 88 S.Ct. 967, suggesting that, where several eyewitnesses are available, police photographs should be shown initially to only one or two of them, in order that any photographic identification may later be supplemented with corporeal identifications by witnesses who have viewed lineups, but not photographs. By contrast, *see United States v. Coades*, 468 F.2d 1061 (3d Cir. 1972), finding no danger of misidentification despite an extremely lengthy and repetitive series of photo displays and lineups. *See also United States v. Jackson*, 166 U.S.App.D.C. 166, 509 F.2d 490, 503–04 (1974), questioning whether an unverified statement from a paid informant would alone have enabled police to compel appellant's presence in a lineup, but finding that, in any event, police had behaved properly in seeking an eyewitness photo identification to supplement previously obtained information.
(3) Photo arrays, like lineups, should be constructed so as to avert an artificial focus of attention upon a particular individual. To the extent possible, police should strive for similarity in the physical characteristics and attire of the subjects portrayed, as well as in the official markings, if any, on the photographs themselves. A recent article has proposed the following guidelines:
At least ten photographs should be shown to each witness. All photographs should be of people who have similar age, complexion, hair, and hairstyle. When full length photographs are used, the height and weight should be similar. The photographs should not be of different size and mixed batches of

photographic representation of the lineup conducted in this case convinces us that that procedure was eminently fair; and indeed appellants do not contend otherwise. While one photo array shown to Mary Roach, a teller at the Seventh Street branch bank, contained only three pictures and therefore might appear more suspect than the displays in *Simmons*, the latter suffered from a malady even more troublesome than insufficient size. As noted above, Simmons's likeness appeared several times in the set of snapshots shown to the bank employees. Even a witness of less than ordinary alertness could have been expected to notice the repeated occurrence of a particular face in the various group photos. Given *Simmons*, we regard trial counsel's failure to object to the identification testimony in this case as understandable and certainly within the bounds of reasonable competence.

With the exception of their complaints about the timing of the photo displays, appellants make no assertions that the pretrial photo showings actually *were* suggestive in specific ways. Instead, we are apparently asked to *assume* that the pretrial identification procedures were constitutionally defective, and then to reverse appellants' convictions because trial counsel did

not notice the defects. This we are unwilling to do. Appellants contend that their inability to allege particular deficiencies could have been alleviated if a suppression hearing had been convened to help uncover evidence of impermissible suggestiveness. To this predicament, we can only respond that this is precisely the reason that ineffective assistance claims should be initially addressed to the trial court.[14]

In any event, appellants presently have represented to us that "all of the facts that are relevant for the determination of the ineffective assistance of counsel issue are in the record." Brief for Appellants at 27. Looking to those record facts we find, as indicated above, no warrant for reversal on that ground.[15]

## II

■ Appellant Gartrell seeks reversal of his conviction on the ground that the district judge erred in ruling that a prior conviction would be admissible for impeachment purposes if Gartrell chose to testify in his own defense. The trial in this case was held on July 17, 18, and 21, 1975. The new Federal Rules of Evidence became effective on July 1, 1975. The impeachment by prior conviction issue, therefore, was and is governed by Fed.R.Evid. 609(a).[16] Gartrell's

---

black and white and color photographs should not be used.
Eisenberg and Feustel, *Pretrial Identification: An Attempt to Articulate Constitutional Criteria*, 58 Marq.L.Rev. 659, 683 (1975).

**14.** The appropriate method for presenting ineffective assistance claims was outlined in *De-Coster, supra* :

[W]hen a claim of ineffective assistance is contemplated, it should first be presented to the district court in a motion for a new trial. In such proceeding evidence *dehors* the record may be submitted by affidavit, and when necessary the district judge may order a hearing or otherwise allow counsel to respond. If the trial court is willing to grant the motion, this court will remand. If the motion is denied, the appeal therefrom will be consolidated with the appeal from the conviction and sentence. The record of any hearing held on the motion, and any documents submitted below, will become part of the record on appeal.
487 F.2d at 1204–05.

**15.** Given our disposition of appellants' ineffective assistance argument, we deem it unnecessary to reach such issues as:

(i) the existence of an independent source for eyewitnesses' identifications of appellants at trial;
(ii) constitutional limitations *vel non* on the admissibility of eyewitness identification testimony under 18 U.S.C. § 3502 (1970); and
(iii) harmless error.

**16.** Rule 609. Impeachment by Evidence of Conviction of Crime

(a) General rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2)

claim in this regard presents difficulty, because the controlling relevance of Rule 609 was unrecognized at trial. In the colloquy of record about admissibility, the Rule was never mentioned by the prosecution, the defense, or the court. The district judge seems to have decided to permit use of Gartrell's prior conviction by reference to earlier law in this Circuit. *See Luck v. United States*, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965); *Gordon v. United States*, 127 U.S.App.D.C. 343, 383 F.2d 936 (1967), *cert. denied*, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968). This was error.

Despite substantial surface similarity, the inquiry to be conducted by the trial court under Rule 609(a) differs significantly from that mandated by *Luck* and its progeny. Adherence to the proper standard by the District Court might have produced a different ruling on the impeachment question. Had evidence of his prior conviction been

excluded, appellant Gartrell in all likelihood would have taken the stand and the jury presumably would have heard him deny participation in the bank robbery. As explained further below, we cannot say, on the facts of this case, that failure to apply Rule 609 constituted harmless error. Therefore, we remand the case to the District Court for a determination of whether, within the meaning of Rule 609(a), the probative value of Gartrell's prior conviction outweighs its prejudicial effect.[17] If it decides that the prior conviction was admissible, the conviction stands, subject to further review on appeal; if it decides that it should have been excluded, the conviction is reversed and a new trial ordered.[18]

Judicial construction of the provisions of Rule 609 has thus far been rather sparse, especially when contrasted with the veritable flood of decisions treating problems of impeachment by prior conviction under the *Luck* norms.[19] Our review of the available

involved dishonesty or false statement, regardless of the punishment.

\* \* \* \* \* \*

17. Since we are persuaded that the District Court did not operate within the proper framework in evaluating the admissibility of Gartrell's prior conviction, we need not assess the independent significance of the lack of an *explicit* finding that probative value outweighs prejudicial effect to the defendant. In particular, we need not decide whether the lack of such a finding inevitably implies a failure to exercise meaningfully the discretion conferred upon the trial court by Rule 609. Likewise we do not reach the question of whether a trial judge must provide an on-the-record explanation of his Rule 609 findings. However, it must be obvious to any careful trial judge that an *explicit* finding in the terms of the Rule can be of great utility, if indeed not required, on appellate review, *see Dorszynski v. United States*, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974), and some indication of the reasons for the finding can be very helpful.

18. Our disposition of the present case may at first glance seem inconsistent with a recent holding of the Seventh Circuit in *United States v. Mahone*, 537 F.2d 922, 928–29 (7th Cir. 1976). However, we believe that the two decisions can be reconciled on careful reading.

Rather than making an explicit Rule 609 determination that the probative value of prior conviction evidence outweighed its prejudicial effect to the defendant, the trial judge in *Mahone* stated simply, "[I]f the defendant takes

the stand and testifies, the Court will permit, on the basis of the record now before it, impeachment of this defendant in the normal manner by the robbery conviction." The Seventh Circuit found that, despite this failure to recite the litany instituted by Rule 609(a)(1), the trial judge nevertheless *did* engage in a meaningful exercise of the discretion granted him by the Rule. Commenting that the record before the trial court "consisted of argument by the parties over [the] very matters" of prejudicial effect and probative value, the appellate tribunal decided that the district judge's ruling "indicate[d] implicitly" that a Rule 609 weighing had taken place. Nowhere does the Seventh Circuit's opinion declare that the District Court was unaware of the relevance of the newly effective Federal Rules of Evidence. The reported availability in the record of argument concerning the probative value and prejudicial effect of prior conviction evidence further distinguishes *Mahone* from the case now before us. Finally, even the facts presented in *Mahone*, notably more conducive to affirmance than those we now consider, prompted the Seventh Circuit to urge prospectively that trial judges make explicit Rule 609 findings on the record.

19. *See, e. g., Weaver v. United States*, 133 U.S.App.D.C. 66, 408 F.2d 1269, *cert. denied*, 395 U.S. 927, 89 S.Ct. 1785, 23 L.Ed.2d 245 (1969) (appendix surveys decisions rendered by this court during three years immediately following *Luck* opinion; enumerates twenty-four cases in which impeachment by prior conviction issue was raised on appeal and discussed

materials persuades us that Rule 609 has been designed to work at least three important changes in the approach of federal courts to the problems of impeachment by prior conviction:

(i) Evidence of *some* prior convictions (i. e., convictions for crimes involving dis- honesty or false statement) is now *automatically* admissible for the purpose of attacking the credibility of a witness. With respect to these convictions, trial courts are no longer free to exercise the discretion they enjoyed under *Luck*.[20] Congress has substituted its judgment

---

in opinion). *Luck*, of course, continued to hold sway during the more than six years between issuance of the *Weaver* opinion and effectiveness of the Federal Rules of Evidence. No noticeable slackening of the frequency of criminal appeals presenting *Luck* questions occurred during that period. Moreover, the *Weaver* summary dealt only with this circuit. For a circuit-by-circuit analysis of the state of the law prior to the effectiveness of Rule 609, *see* 3 Weinstein's Evidence ¶ 609[03], at 609–62 n. 2 (1975). *See also United States v. Belt*, 169 U.S.App.D.C. 1, 514 F.2d 837, 844 n. 12 (1975).

**20.** *But see* Fed.R.Evid. 403, which provides:

Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The potential interaction between Rule 403 and Rule 609(a) elicited comment at legislative hearings on the Proposed Federal Rules of Evidence. Although it offers no solutions, the following colloquy between Congressmen Dennis and Hungate and Judge Friendly is instructive:

Judge FRIENDLY. [D]o you really think if you were on a jury, you would not like to know if the witness had committed a murder. I think I would like to know.

Mr. DENNIS. I think I would like to know it, but I think it is very unfair to ask a man who is on trial for some irrelevant or unrelated offense, whether he committed murder or manslaughter 5 years ago. All it does is prejudice the case. It has nothing to do with his credibility in my judgment, especially murder. That is the primary example. Those are usually one time offenses.

Judge FRIENDLY. Perhaps in taking murder I chose an unfortunate case. But, of course, there is the overriding rule that the judge can always exclude testimony where probative value he thinks is outweighed by its prejudicial effect and perhaps in the case we are discussing he should do that.

Mr. HUNGATE. Would that be true with or without the rules?

Judge FRIENDLY. That is true today.

Mr. HUNGATE. Would it remain true if these rules became effective?

Judge FRIENDLY. I assume they have such a rule in here. I could easily check.

Mr. DENNIS. It seems to me if he has to follow this rule [*i. e.,* Rule 609(a)] he does not have much discretion. Maybe he still could rule something out. I am not sure.

Mr. HUNGATE. I apologize for interrupting. Go ahead.

Mr. [sic] FRIENDLY. I want to check whether there was such a general rule. I thought there was.

\* \* \* \* \* \*

Mr. HUNGATE. I believe section 403 is the rule to which you are referring. [Quotes the rule.]

Judge FRIENDLY. I think the Congressman's point is a good one. You have the problem: Does that apply when there is a specific rule on the subject? This just says relevant evidence may be excluded if it has this effect. But then somebody is going to argue, this other rule dealt very specifically with the question and rule 403 is out. I don't know what the answer would be.

Rules of Evidence, Hearings on S. 583, H.R. 4958, and H.R. 5463 Before the Special Subcomm. on Reform of Federal Criminal Laws of the House Comm. on the Judiciary, 93d Cong., 1st Sess., ser. 2, at 251–52 (1973). (In connection with Congressman Dennis's remark about the limited discretion available to a trial judge under Rule 609(a), at the time of the above exchange the version of the rule under consideration mandated that *all felony* convictions, as well as all convictions for crimes involving dishonesty or false statement, be automatically admissible for impeachment purposes.)

As Judge Friendly observed, the language of Rule 609(a)(2) is absolute in nature, suggesting that the subsection's command, authorizing use of prior convictions for crimes involving dishonesty or false statement, may not be abrogated by reference to Rule 403. Partial support for this proposition can be derived from the original Advisory Committee Note to Rule 403, a rule whose text remained unchanged throughout Congressional consideration. The Advisory Committee said that Rule 403 was "designed as a guide for the handling of situations for which no specific rules have been formulated." Since Gartrell's prior crime, attempted robbery, did not involve dishonesty or false statement as those terms are used in Rule 609(a)(2) (*see* text accompanying notes 26–30 *infra*), we express no opinion on the issue of whether evidence admissible under Rule

that evidence of such crimes is always sufficiently related to credibility to justify its admission, regardless of possible prejudice to the defendant. *See* H.R. Conf.Rep.No. 93–1597, 93d Cong., 2d Sess. 9, *reprinted in* [1974] U.S.Code Cong. & Admin.News, 7098, 7103.

(ii) The addition of the phrase "to the defendant" at the end of Rule 609(a)(1) reflects a deliberate choice to regulate impeachment by prior conviction *only* where the *defendant's* interests might be damaged by admission of evidence of past crimes, and *not* where the prosecution might suffer, or where a non-defendant witness complains of possible loss of reputation in the community.[21] This procedure may be contrasted with earlier

possibilities under *Luck.* Although in practice *Luck* hearings were most frequently conducted to determine whether a criminal defendant who wished to testify could be impeached with evidence of his prior convictions, in theory the *Luck* discretionary standard was equally applicable to all witnesses and parties. In order to avoid undue prejudice to *any* individual, the trial court could exclude prior conviction evidence which it concluded had only limited probative value with respect to credibility.

(iii) Crucial for present purposes, the language of Rule 609(a)(1), as enacted, manifests an intent to shift the burden of persuasion with respect to admission of prior conviction evidence for impeachment. *Luck* held that such evidence

---

609(a)(2) may nevertheless be excluded by a trial judge in the exercise of his discretion under Rule 403.

21. The Conference Committee Report states: The danger of prejudice to a witness other than the defendant . . . was considered and rejected by the Conference as an element to be weighed in determining admissibility. It was the judgment of the Conference that the danger of prejudice to a nondefendant witness is outweighed by the need for the trier of fact to have as much relevant evidence on the issue of credibility as possible. Such evidence should only be excluded where it presents a danger of improperly influencing the outcome of the trial by persuading the trier of fact to convict the defendant on the basis of his prior criminal record.

H.R.Conf.Rep.No. 93–1597, 93d Cong., 2d Sess. 9–10, *reprinted* in [1974] U.S.Code Cong. & Admin.News pp. 7098, 7103. In explaining the Conference Report and urging adoption of the new Federal Rules, Representative Hungate, the leading Conference Committee Manager, announced flatly that Rule 609(a) "means that in a criminal case the prior felony conviction of a prosecution witness may always be used." 120 Cong.Rec.H. 12,254 (daily ed. Dec. 18, 1974). Similarly, Representative Dennis, another Conference Committee member, told the House that "now a defendant can cross examine a government witness about any of his previous felony convictions; he can always do it, because that will not prejudice him in anyway [sic]. . . . Only the Government is going to be limited. . . ." *Id.* at H. 12,257.

In his treatise on the Federal Rules of Evidence, Judge Weinstein recognizes the accuracy of the above descriptions of the effect of

Rule 609(a). Prosecution witnesses may be impeached by their prior felony convictions, subject only to Rule 611(a)(3)'s instruction that the court exercise control over interrogation so as to "protect witnesses from harassment or undue embarrassment." *See* 3 Weinstein's Evidence ¶ 609[03], at 609–66 n. 11 and accompanying text (1975). However, in *United States v. Jackson*, 405 F.Supp. 938 (E.D.N.Y.1975), Judge Weinstein fashioned a significant modification of the rule that prior felony convictions may always be used to impeach prosecution witnesses.

Defendant in *Jackson* was charged with armed bank robbery. His record revealed a recent state felony conviction for assault. One or more government witnesses apparently also had prior assault convictions. Judge Weinstein excluded evidence of defendant's prior conviction, but conditioned the exclusion upon defense counsel's agreement to refrain from using prior assault convictions to impeach prosecution witnesses, absent the court's express advance approval of such tactics. Imposition of this condition was justified by a pretrial finding that if government witnesses *were* so impeached, then the probative value of *defendant's* assault conviction *would* outweigh the risk of prejudice under Rule 609(a). Judge Weinstein asserted that, under the general purpose formulation of Rule 102, district judges are obliged to "interpret the [Federal] Rules [of Evidence] creatively." 405 F.Supp. at 943. (Rule 102 directs that the rules "be construed to secure fairness in administration, . . . and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined.")

could be excluded "where the trial judge believes the prejudicial effect of impeachment *far* outweighs the probative relevance of the prior conviction to the issue of credibility." 348 F.2d at 768 (emphasis added). *Gordon* reiterated this test, and emphasized that "[t]he burden of persuasion in this regard is on the accused . . . .. The underlying assumption [of *Luck*] was that prior convictions would ordinarily be admissible unless this burden is met." 383 F.2d at 939. Presumably, the House Subcommittee version of Rule 609(a)(1) would have preserved the approach already developed by the case law in this Circuit. As amended by the Subcommittee, the rule provided that previous felony convictions could be used to impeach a witness "*unless* the court determines that the danger of unfair prejudice outweighs the probative value of the evidence of the conviction[s]." [22] H.R.Rep.No. 93–650, 93d Cong., 1st Sess. 11, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7075, 7084 (emphasis added). Rejecting this option, the version of Rule 609 which ultimately emerged from the Conference Committee and became law allows impeachment by prior felony conviction (for a crime not involving dishonesty or false statement) "*only* if . . . the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant." Fed.R.Evid. 609(a)(1) (emphasis added). This modest variation in language is not purely semantic. The prosecution now must bear the burden of establishing that prior conviction evidence should be admitted. Our grammatical interpretation of the bare wording of Rule 609 is reinforced by the remarks of two leading conferees during debate on the floor of the House. Defending the Conference Committee product, Congressman Dennis said,

> What the present compromise does is to say that you can inquire on cross examination about these [sic] type of prior convictions which really bear on credibility, and you can ask about all other felonies on cross examination, only if you can convince the court, and the burden is on the government, which is an important change in the law, that the probative value of the question is greater than the damage to the defendant. . . .

120 Cong.Rec.H. 12,257 (daily ed. Dec. 18, 1974). Representative Hungate declared, "[T]he rule puts the burden on the proponent of [prior conviction] evidence to show that it should be used—to show that the probative value of the evidence outweighs its prejudicial effect to the defendant." *Id.* at 12,254. *See also United States v. Mahone*, 537 F.2d 922, 929 (7th Cir. 1976).

The labyrinthine history of Rule 609 has been authoritatively canvassed elsewhere.[23] We mention only those aspects of the Rule's background which bear on the present controversy. Rule 609 was one of the most hotly contested provisions in the Federal Rules of Evidence.[24] The current language

---

**22.** The debt to *Luck* was even more apparent in the March, 1971 draft of the Proposed Federal Rules of Evidence, 61 F.R.D. 315, 391 (1971), published after an earlier version had undergone substantial revision before the Standing Committee on Rules of Practice and Procedure of the Judicial Conference of the United States. Under the 1971 draft, impeachment by prior conviction was permitted, unless the trial judge determined "that the probative value of the evidence of the crime [was] *substantially* outweighed by the danger of unfair prejudice." (Emphasis added.) The Advisory Committee's Note expressly acknowledged that the quoted limitation had its "genesis" in the *Luck* decision. *Id.* at 393.

**23.** *See* 3 Weinstein's Evidence 609–2 to –55 (1975). *See also United States v. Jackson*, 405 F.Supp. 938, 940–42 (E.D.N.Y.1975) (Weinstein, J.).

**24.** At least three alternatives were formally considered by the Advisory Committee before the Proposed Rules were transmitted to Congress. *See* 3 Weinstein's Evidence 609–46 to –49 (1975). Also during this preliminary period, several correspondents urged unsuccessfully that the Committee endorse the solution then embodied in Rule 21 of the Uniform Rules of Evidence. As approved in 1953 by the National Conference of Commissioners on Uniform State Laws, Rule 21 permitted introduction of prior conviction evidence only where

of the Rule is unquestionably the product of careful deliberation and compromise. The House of Representatives and the Senate Judiciary Committee agreed that *criminal defendants* should not be impeached by evidence of prior convictions unless the earlier offenses involved dishonesty or false statement. Adoption of this position by the full Senate was blocked only at the last moment, only by a bare majority, and only after Senator McClellan had succeeded in forcing a second vote on the matter.

Faced with the task of forging a consensus between views both strongly held and widely divergent, the Conference Committee was aware of the substantial sentiment in both chambers for limiting impeachment by prior conviction, especially in the criminal defendant-as-witness context. The House debate almost ten months earlier was particularly revealing. As reported by the Judiciary Committee, Rule 609 banned impeachment by prior conviction, regardless of the identity of the witness, except where the crime in question had involved dishonesty or false statement. Representative Hogan vigorously pressed for amendment of the proposal to authorize impeachment by any prior felony conviction. Resurrecting the suggestion previously advanced by a

the underlying crime involved dishonesty or false statement, and barred all such impeachment of a criminal defendant who elected to testify in his own behalf, unless he had "first introduced evidence admissible solely for the purpose of supporting his credibility." The American Law Institute had taken the same approach a decade earlier in Rule 106 of its Model Code of Evidence (1942).

The final Supreme Court version of Rule 609 essentially represented a codification of existing law in the majority of American jurisdictions. A witness could be impeached by any prior conviction for a felony or a crime involving dishonesty or false statement. The Special House Subcommittee which initially examined the Proposed Rules rejected this, and offered a substitute based on *Luck*. Following the approach of the Uniform Rules and the Model Code, the full House Judiciary Committee elected to further restrict impeachment by prior conviction. Credibility was to be challenged only with convictions for crimes involving dishonesty or false statement. The House membership accepted this scheme, and sent the Judiciary Committee draft to the Senate. The

Special House Subcommittee, Representative Smith countered with a compromise amendment along the lines of *Luck*. Sitting as a Committee of the Whole, the House first replaced the Hogan amendment with the Smith amendment, and then rejected the latter in favor of the Judiciary Committee version by a vote of 48–10. 120 Cong.Rec.H. 551–57 (daily ed. Feb. 6, 1974). The small minority of members voting overwhelmingly favored the "dishonesty or false statement" approach. The Conference Committee sought a formula which would improve upon *Luck* in providing at least the appearance of more definite restrictions on the use of prior convictions for impeachment purposes. At the same time, the Conference could not avoid the fact that a narrow majority of the Senate wished to permit impeachment with any prior felony conviction.[25] Rule 609, as currently effective, resolves these opposing tensions by retaining the trial court's discretion to allow impeachment with any prior felony, but shifting to the prosecution the burden of demonstrating that probative value on the issue of credibility outweighs prejudicial effect to the defendant.

 The Government has contended, both in its brief and on oral argument, that

corresponding Senate committee injected a new variable by advocating that Rule 609 be revised to differentiate between defendant and non-defendant witnesses. As to the former, the Senate Judiciary Committee concurred in the recommendation of its House counterpart. With respect to non-defendant witnesses, however, the Committee suggested a restrictive discretionary standard which allocated the burden of persuasion to the proponent of prior conviction evidence. On the Senate floor, Senator McClellan launched an attempt to scrap the new committee proposal in favor of a return to the original Supreme Court version of Rule 609. The McClellan amendment was first "defeated" by a tie vote, but was subsequently passed by a narrow margin on motion to reconsider.

25. In addition, the entire legislative consideration of Rule 609 was informed by the fact that, in the District of Columbia Court Reform and Criminal Procedure Act of 1970, Congress as a whole had decided to permit use of any prior felony conviction to attack credibility in the District of Columbia courts. *See* D.C.Code § 14–305(b)(1)(A) (1973).

Gartrell's earlier crime, attempted robbery, involved "dishonesty or false statement," as that phrase is used in the Federal Rules of Evidence. If this contention were accurate, the Government would be correct in its conclusion that Rule 609(a)(2) provides for the *automatic* admissibility of evidence of Gartrell's prior conviction. The District Court's decision could be upheld, even though rendered without reference to the newly-applicable Rules. However, the Government has misconstrued the language in question, partially through a misplaced reliance on comments of this court in cases decided under *Luck.* Attempted robbery is not a crime involving "dishonesty or false statement" within the meaning of Rule 609(a)(2). If Gartrell's prior conviction is to be admitted at all, it must be admitted only after the court makes the determination prescribed in Rule 609(a)(1).

The Conference Committee Report fully supports this position:

> By the phrase "dishonesty and false statement" the Conference means crimes such as perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully.

H.R.Conf.Rep.No. 93–1597, 93d Cong., 2d Sess. 9, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7098, 7103. Numerous remarks made in the course of floor debate, set forth in the Appendix to this opinion, substantiate the interpretation that robbery may not be classified legitimately as an "offense in the nature of crimen falsi." Congress clearly intended the phrase to denote a fairly narrow subset of criminal activity. Moreover, research into the derivation of the term "crimen falsi" indicates that Congress's restrictive construction comports with historical practice. While commentators have uncovered some divergence between civil and common law usage, the expression has never been thought to comprehend robbery or other crimes involving force.[26] Even in its broadest sense, the

---

**26.** Under Roman law, where the term originated, "crimen falsi" included "not only forgery, but every species of fraud and deceit." 1 S. Greenleaf, A Treatise on the Law of Evidence § 373, at 514 & n. 3 (16th ed. 1899). Apparently, no practical importance attached to the classification. Rather, it functioned purely as a label, referring to violations of the *Lex Cornelia de Falsis.* This statute, enacted in 81 B.C., was designed to curtail the then prevalent practice of "forging, altering, destroying, and substituting wills." 15 S.P. Scott, The Civil Law 47 n. 1 (1932). Severe sanctions (usually banishment, deportation, or death) were provided for transgressors. As was typical of the Roman criminal law, development and expansion of the *Lex Cornelia* was accomplished gradually through a combination of senate decrees, imperial constitutions, subsequent legislation, and judicial interpretation. *See* A. Berger, Encyclopedic Dictionary of Roman Law 418 (1953). This process was presumably still in progress at the time of Justinian (c. 530 A.D.), whose Institutes report that the *Lex Cornelia* "imposes a punishment on him who has written, sealed, read or substituted a forged testament or other document, or has made, engraved or impressed a false seal, knowingly and with evil intent." The Institutes of Justinian, 452 (J. Abdy and B. Walker trans. 1876). Ultimately, the scope of the *crimen falsi* was enlarged to include false swearing, subornation of perjury, forgery, the execution or attestation of any written instrument, conspiracy to cause the death of innocent persons, counterfeiting, and the sale or suppression of testimony. This was the *crimen falsi* of Roman jurisprudence, which, while embracing nearly every species of deceit by whose agency anyone might be prejudiced, or deprived of his rights, was generally synonymous with the fabrication, or fraudulent alteration of documents to which, when not otherwise distinctly specified, it was presumed to refer.

15 S.P. Scott, *supra* at 47 n. 1. *See also* S. Hallifax, An Analysis of the Civil Law 170–71 (1836), listing as examples of the *crimen falsi* at Roman law (i) a supposititious birth [*i. e.* fraudulent substitution of one child for another]; (ii) false weights and measures; (iii) selling or mortgaging the same thing to two persons in two several contracts; and (iv) supporting the lawsuit of another by money, witnesses, or patronage.

At common law, the term had a more limited range, reflecting the purpose for which it had been borrowed from the civil systems. Along with conviction for treason or a felony, conviction of a crime subsumed under the heading *crimen falsi* disqualified an individual, at common law, from serving as a witness in a legal proceeding. Greenleaf explains:

term "crimen falsi" has encompassed only those crimes characterized by an element of deceit or deliberate interference with a court's ascertainment of truth. As graphically observed by Senator McClellan, robbery is not such a crime:

> There is no deceit in armed robbery. You take a gun, walk out, and put it in a man's face and say, "Give me your money," or walk up to the counter of the cashier and say, "this is a holdup; give me your money." There is no deceit in that. They are not lying. They mean business. They will murder you if you do not do it.

120 Cong.Rec.S. 19913 (daily ed. Nov. 22, 1974).

■■■ Our interpretation of the words "dishonesty or false statement" is consistent with that adopted by the majority of courts which have had occasion to apply Rule 609(a)(2) in the period since July 1, 1975. In *United States v. Millings*, 175 U.S.App.D.C. 293, 535 F.2d 121 (1976), this court held that "dishonesty or false statement" did not comprehend either of appellant's two prior convictions, one for unlawful possession of narcotics, the other for carrying a pistol without a license. Judge Robb explained:

> An intent to deceive or defraud is not an element of either offense. . . . Certainly we cannot say that either offense, in the language of the Conference Committee, is "peculiarly probative of credibility". Although it may be argued that any willful violation of law . . . evinces a lack of character and a disregard for all legal duties, including the obligations of an oath, Congress has not accepted that expansive theory.

535 F.2d at 123.[27] Two recent Third Circuit

---

In regard to the two former, as all treasons, and almost all felonies, were punishable with death, it was very natural that crimes, deemed of so grave a character as to render the offender unworthy to live, should be considered as rendering him unworthy of belief in a court of justice.

1 S. Greenleaf, *supra* at 513–14. The *crimen falsi* category was added because a number of offenses, supposedly bearing directly on credibility, did not constitute felonies at common law. Among this group were perjury, subornation of perjury, suppression of testimony by bribery, conspiracy to procure the absence of a witness, and conspiracy to accuse another of a crime. Since, by hypothesis, persons convicted of such crimes had a special propensity to testify falsely, the common law sought to exclude them from the ranks of potential witnesses. The *crimen falsi* designation was employed to this end. The distinguishing characteristic of crimes listed under the *crimen falsi* rubric at common law was their close relationship to the judicial process. "[P]rivate cheats, such as the obtaining of goods by false pretences, or the uttering of counterfeit coin or forged securities" were not included. *Ex parte Wilson*, 114 U.S. 417, 423, 5 S.Ct. 935, 938, 29 L.Ed. 89 (1885); 1 S. Greenleaf, *supra* at 514–15.

*Pendock v. Mackinder*, 125 Eng.Rep. 1375 (C.P. 1755), cited by the Supreme Court in *Wilson*, 114 U.S. at 422, is instructive for our purposes. *Pendock* involved a challenge to the validity of a will. The question presented was whether an individual convicted over twenty years earlier for petty larceny could legitimately serve as a witness to the signing of that will. The court decided that he could not, holding that petty larceny was sufficiently similar to the felony of grand larceny to justify imposition of testimonial incompetence upon persons convicted of the lesser offense. The court thus reached its result by analogizing a crime clearly not a true felony (*see* 3 W. Holdsworth, A History of English Law 366 (6th ed. 1934)) to its more serious counterpart. The notion that an identical outcome could have been produced through the expedient of application of the *crimen falsi* label to petty larceny was not mentioned and apparently not considered. The term simply did not extend so far.

More recent sources have blurred the distinction between the civil and common law conceptions of the *crimen falsi* *See, e. g.,* 1 R. Anderson, Wharton's Criminal Law and Procedure § 31, at 63 (1957); *United States v. Escobedo*, 430 F.2d 14, 21 (7th Cir. 1970) (Kiley, J., concurring), *cert. denied*, 402 U.S. 951, 91 S.Ct. 1632, 29 L.Ed.2d 122 (1971). *See also* Black's Law Dictionary 446–47 (rev. 4th ed. 1968). However, this confusion should not obscure the fundamental point, which is that robbery and other crimes of violence were not included among the *crimen falsi* under *either* standard. Historically, some element of fraud or deceit has always been a prerequisite, even under the broadest reading of the ancient term.

27. The court's opinion explicitly mentioned the oddity of legislative history which differentiates the "dishonesty or false statement" language in Rule 609(a)(2) from an earlier appearance of the same phrase in D.C.Code § 14–305(b)(1)(B). *See* Appendix. In light of the dissimilar backgrounds of the two provisions, the court refused to rely on District of Colum-

cases, decided the same day, have argued convincingly that petty larceny is not ordinarily a crime involving dishonesty or false statement under Rule 609(a)(1). *See Government of Virgin Islands v. Toto*, 529 F.2d 278, 282 (3rd Cir. 1976) (reviewing a March, 1975 trial, and therefore applying the circuit's traditional *crimen falsi* limitation on impeachment by misdemeanor conviction, but construing Rule 609(a)(2) in dictum); [28] and *Government of Virgin Islands v. Testamark*, 528 F.2d 742, 743 (3d Cir. 1976) (actually applying Rule 609(a)(2), and holding that the new enactment tracks the circuit's long-standing *crimen falsi* restriction). *Contra, United States v. Carden*, 529 F.2d 443, 446 (5th Cir. 1976) (holding, without the benefit of argument by the parties, that a petty larceny conviction was properly admitted for impeachment purposes, "since the crime at issue involved dishonesty"). The Seventh Circuit, in *United States v. Mahone*, 537 F.2d 922 (7th Cir. 1976) simply found it unnecessary to discuss whether evidence of a prior *robbery* conviction might be admitted under Rule 609's "dishonesty or false statement" provision, focusing its attention instead solely on the discretionary language of Rule 609(a)(1) (*see* note 18 *supra*). In like manner, at least two District Courts have apparently regarded the "dishonesty" issue as too clear for comment. *See United States v. Brown*, 409 F.Supp. 890 (W.D.N.Y.1976) (excluding prior conviction for illegal narcotics possession); and *United States v. Jackson*, 405 F.Supp. 938 (E.D.N.Y.1975) (excluding prior conviction for assault). *See also Carlsen v. Javurek*, 526 F.2d 202, 210 (8th Cir. 1975) (dictum in civil case recognizing that misdemeanor

conviction for assault and battery would not be admissible under Rule 609, because prior crime did not involve dishonesty or false statement).

The Government has invoked *Gordon v. United States*, 127 U.S.App.D.C. 343, 383 F.2d 936, *cert. denied*, 390 U.S. 1020, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1967), and *United States v. Simpson*, 144 U.S.App.D.C. 259, 445 F.2d 735 (1970), in aid of the proposition that stealing, and in particular the crime of robbery, involves dishonesty or false statement under Rule 609(a)(2). *Gordon* and *Simpson* are not unique. Other cases decided by this court pursuant to the *Luck* standard might also have been cited. *See, e. g., Gass v. United States*, 135 U.S.App.D.C. 767, 416 F.2d 767 (1969); *Smith v. United States*, 132 U.S.App.D.C. 131, 406 F.2d 667 (1968), *cert. denied*, 394 U.S. 963, 89 S.Ct. 1315, 22 L.Ed.2d 753 (1969); and *Williams v. United States*, 129 U.S.App.D.C. 332, 394 F.2d 957 (D.C.Cir.), *cert. denied*, 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445 (1968). *But see United States v. McCord*, 420 F.2d 255 (1969). The simple answer to the Government's argument is that none of these cases involved Rule 609. *Luck* had held that, under the then applicable version of D.C.Code § 14–305,[29] trial courts should exercise discretion in determining whether to permit impeachment by prior conviction. 348 F.2d at 767–69. *Gordon* represented the effort of this tribunal to be helpful to the District Court in its exercise of that discretion. The nature of the prior crime was one factor identified in both the *Luck* and *Gordon* opinions as relevant to the impeachment issue. When Judge (now

---

bia precedents which had held that both unlawful possession of narcotics and carrying a pistol without a license involved dishonesty or false statement within the meaning of § 14–305. *See* 535 F.2d at 124.

**28.** Of course, if a statutory petty larceny offense is committed not by stealth, but by fraudulent or deceitful means, *e. g.*, taking by false pretenses, it may qualify as a crime involving dishonesty or false statement. Where the formal title of an offense leaves room for doubt, automatic admissibility under Rule 609(a)(2) will normally not be permitted, unless the prosecution first demonstrates to the court, outside

the jury's hearing, that a particular prior conviction rested on facts warranting the dishonesty or false statement description. *Id.* at 281 n. 3.

**29.** D.C.Code § 14–305 (1961) read in pertinent part:

No person shall be incompetent to testify, in either civil or criminal proceedings, by reason of his having been convicted of crime, but such fact *may* be given in evidence to affect his credit as a witness . . . . [Emphasis added.]

Chief Justice) Burger, writing in *Gordon,* characterized stealing as "conduct which reflects adversely on a man's honesty and integrity," he was not holding that all prior convictions for theft and related crimes were automatically admissible for impeachment purposes. He said merely that such offenses had some bearing on an individual's credibility, a bearing which the trial court should consider in exercising its discretion. By contrast, the *Gordon* opinion noted, acts of violence "generally have little or no direct bearing on honesty and veracity," thus implying that virtually any showing of prejudicial effect should be sufficient to exclude evidence of such prior convictions. *See* 383 F.2d at 940.

■ The issue under Rule 609(a)(2) is entirely different from that confronted by this court in *Gordon, Simpson,* and other cases descendant from *Luck.* The new Rule provides that a prior conviction for a crime involving dishonesty or false statement is *automatically* admissible for impeachment purposes. With respect to such evidence, the trial court enjoys no discretion. *See* text accompanying note 20 *supra.* In its Conference Committee Report, Congress has spelled out the meaning of the phrase "dishonesty or false statement" as it is used in Rule 609(a)(2). *See* text preceding note 26 *supra.* The Report plainly shows that the set of crimes involving dishonesty or false statement under the Rule is not coterminous with the set of crimes bearing on credibility in the *Luck-Gordon* analysis. The *Gordon* and *Simpson* precedents are not

controlling in this case, and indeed are essentially irrelevant.[30]

As we indicated at the beginning of this part of our opinion, we cannot view as harmless error (28 U.S.C. § 2111 (1970); Fed.R.Crim.P. 52) the trial court's failure to follow Rule 609 in deciding whether to permit impeachment of Gartrell by prior conviction evidence.[31] Gartrell expressed a desire to testify in his own defense. His attorney informed the District Court that Gartrell wished to deny any connection with the robbery. We can only infer that Gartrell was dissuaded from this intention primarily by the trial court's refusal to exclude evidence of his prior conviction, an attempted robbery offense two years earlier for which he had been sentenced to six years' probation.

Admittedly, the Government's evidence in this case was very strong. Two eyewitnesses identified Gartrell at trial as one of the bank robbers. In addition, these same witnesses testified to their previous identification of Gartrell at a police lineup and in various photo displays. The bank film surveillance photographs, depicting an individual closely resembling Gartrell, were introduced into evidence and examined by the jury. On the other hand, these bank photos were somewhat hazy in texture, and may perhaps have left the jurors with some doubt that either of the robbers pictured actually was Gartrell. Moreover, despite Gartrell's presence in a police lineup convened for bank manager Dudley and other

**30.** As the Government stresses, this court *did* say in *Simpson* that the "previous offense of robbery involved dishonesty, and was therefore admissible and relevant to his credibility when [the defendant] essayed the role of witness." 445 F.2d at 737. However, as explained in the text above, the *Simpson* decision was governed by *Luck,* not by Rule 609. More importantly, the *Simpson* panel, in reviewing the trial court's exercise of its *Luck* discretion, sought guidance in what was then the newly-enacted version (now the currently effective version) of D.C.Code § 14–305. (The *Simpson* indictment alleged only D.C.Code offenses.) We neither state nor imply any opinion on the propriety of according such deference to subsequent legislative changes upon review of a trial court's application of an earlier statutory mandate.

*Cf. United States v. Henson,* 159 U.S.App.D.C. 32, 486 F.2d 1292 (1973) (possible *ex post facto* problem). We do note once again that the phrase "dishonesty or false statement" as it is used in D.C.Code § 14–305 (1973) has a legislative history quite different from that associated with the identical language in Rule 609. Whatever their validity in *Simpson,* the court's comments in that case are inapposite here.

**31.** The Government's brief on appeal does not contend that any error committed by the trial court in this regard was harmless. At oral argument, counsel for the Government, in her concluding sentence, did say that any District Court error on the impeachment question in this case was harmless.

witnesses, Dudley picked two other men (one of them appellant Smith) from the lineup and identified them as the robbers. Had a resolute denial from the witness stand by Gartrell accompanied the indistinct character of the bank photos and the misidentification by Mr. Dudley, his stance before the jury would have been ponderably different.

*Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), held that where an error at trial is of constitutional dimension, an appellate court may not find that error harmless, unless the court is convinced "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24, 87 S.Ct. at 828. Here, however, the District Court's failure to exercise its discretion under Rule 609(a)(1) does not assume constitutional proportions. Indeed, in *United States v. Belt,* 514 F.2d 837, 846–50 (D.C. Cir. 1975), we upheld the constitutionality of D.C.Code § 14–305 (1973), which completely deprives District of Columbia trial courts of the discretion they enjoyed under *Luck,* and dictates the automatic admissibility of any prior felony conviction for impeachment purposes.[32]

We turn then, from *Chapman* to *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the case most frequently cited on harmless error review where constitutional infirmity is not involved. Justice Rutledge's opinion offers the following directives:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or *a specific command of Congress.* . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry

cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

328 U.S. at 764–65, 66 S.Ct. at 1248 (footnote and citation omitted) (emphasis added). Of course, in the case at bar, there has been a departure from a "specific command of Congress." When *Chapman* was decided after *Kotteakos,* the Court addressed itself in terms only to constitutional error. This left violations of a "specific command of Congress" arguably in limbo between *Chapman,* on the one hand, and *Kotteakos,* on the other. But even if it be assumed that the claimant of harmless error with respect to such a violation must meet a more demanding standard than *Kotteakos,* we need not decide here whether such a standard is necessary or how it is to be defined. This is so because, even under *Kotteakos,* we are not "sure that the error did not influence the jury, or had but very slight effect . . . ." nor can we say "with fair assurance . . . that the judgment was not substantially swayed by the error. . . ."

---

The conviction of appellant Smith is affirmed. As to appellant Gartrell, the case is remanded to the District Court for the purpose of the inquiry described above in the text accompanying notes 17 and 18.

*It is so ordered.*

## APPENDIX

Consensus on the meaning of "dishonesty or false statement" appears to have transcended policy disagreements on the general impeachment by prior conviction issue. Senator McClellan's prepared statement, reprinted in the Congressional Record, concentrated predictably on the problem created when an accused takes the stand as a witness:

**32.** Subject only to the age limitations and other minor qualifications imposed by § 14–305(b)(2).

Particularly relevant to a witness's credibility and worthiness of belief is the prior criminal record of such a witness.

Those who favor the rule as reported in this bill [*i.e.,* the Senate Judiciary Committee version; *see* note 24 *supra*] agree that prior convictions do have a bearing on credibility. But they want to limit that judgment only to crimes involving dishonesty or false statement. They make ineligible crimes of murder, rape, armed robbery and other serious felonies. They do not seem to believe that those who have committed these other serious felonies are just as likely to lie under oath as those who have committed crimes involving "dishonesty."

I cannot accept that conclusion. Surely a person who has committed a serious crime—a felony—will just as readily lie under oath as someone who has committed a misdemeanor involving lying. Would a convicted rapist, cold-blooded murderer or armed robber really hesitate to lie under oath any more than a person who has previously lied? Would a convicted murderer or robber be more truthful than such a person?

Of course not!

120 Cong.Rec.S. 19909 (daily ed. Nov. 22, 1974). Substantially similar comments may be found in a memorandum entered into the Record by Senator Hart, *id.,* and in oral declarations by Senators Hruska and Thurmond, *id.* at 19909 and 19912.

The picture in the House was more unsettled. Congressman Hogan believed the drafters were ill-advised to use the phrase "dishonesty or false statement," because it was too imprecise.

The courts would certainly have difficulty with the term "dishonesty" in the present proposal of rule 609(a). Although ordinarily one would think of car theft as involving dishonesty, it might be contended that the "joyriding" type of case did not involve dishonesty. Then, too, one might think that [sic] housebreaking as usually involving dishonesty, but there could be cases where the tres-

pass was obviously not accompanied by any intention to steal or commit any other crime, so that argument could be made that some kinds of offenses normally thought to involve dishonesty did not involve dishonesty on the facts. The standard employed in the committee's rule is simply not a very satisfactory one.

\* \* \* \* . \*

What, really, is dishonesty or false statement in judicial or legal terms? Unless one practices in a jurisdiction which has statutorily defined crimen falsi, the common law definition of "any crime which may injuriously affect the administration of justice, by the introduction of falsehood and fraud" is applicable. This definition has been held to include forgery, perjury, subornation of perjury, suppression of testimony by bribery, conspiracy to procure the absence of a witness or to accuse of crime, obtaining money under false pretenses, stealing, moral turpitude, shoplifting, intoxication, petit larceny, jury tampering, embezzlement and filing a false estate tax return. In other jurisdictions, some of these same offenses have been found not to fit the crimen falsi definition.

120 Cong.Rec.H. 552 (daily ed. Feb. 6, 1974). Congressmen Dennis and Wiggins, not sharing the above reservations about the clarity of the drafters' expression, attempted to dispel their colleagues' doubts and to set the record straight.

Mr. DENNIS. \* \* \* We [*i.e.,* the House Judiciary Committee] have said that, for the purpose of attacking credibility of a witness, evidence that he has been convicted of a crime is admissible only if the crime involved dishonesty or false statement. In other words, if it in fact did bear on his credibility. Certainly, if he has been convicted of perjury or false pretense or fraud or something of that kind, it does reflect on his credibility, but if he stole an automobile when he was 18 years old or if he slugged somebody in a bar 10 years ago or something like that, then it has no connection to his

credibility at all and it should not be inquired about on that basis.

*Id.* at 553.

Mr. WIGGINS. * * * The thrust of "dishonesty" as used in this bill [*i.e.,* the House Judiciary Committee version, described above by Mr. Dennis] goes to his [*i.e.,* a witness'] veracity and his ability to relate the truth. "Dishonesty" is tested, for example, by perjury convictions and convictions dealing with false statements, but not generally criminality. Evidence for a conviction of murder goes to criminality, not to dishonesty.

*Id.* at 555.

Unfortunately, these well-intentioned efforts by knowledgeable legislators did not completely eliminate uncertainty. The following exchange reflects the House's failure to achieve unanimity on the "dishonesty or false statement" matter.

Mr. DANIELSON. * * *

With respect, Mr. Chairman, to the distinction, if any, between the terms "dishonesty" and "false statement," I would like to point out that unless there has been a remarkable change in the meaning of words in recent years, "dishonesty" and "false statement" are not necessarily the same.

I respectfully submit, there is no point in using both terms in section 609(a), unless they mean two different things, or at least that the term "dishonesty" is much broader than "false statement."

Who can state that murder does not involve dishonesty? Who can, for instance, say stealing does not involve dishonesty, then what does it involve?

The terms "dishonest" and "false statement" are not synonymous as used in this code section, and to the extent that we are establishing legislative history here, I want today to make it clear that when I voted for this bill out of committee, and when I vote for it today, it was and is my intention that the term "dishonesty" is broader than "false statement," and any offense involving moral turpitude such as stealing, robbery, burglary, or what have

you, in my opinion is an offense involving dishonesty.

I want to make the record eminently clear that I do not equate "dishonesty" precisely with "false statement."

Mr. HOGAN. Mr. Chairman, will the gentleman yield?

Mr. DANIELSON. Mr. Chairman, I yield to the gentleman from Maryland.

Mr. HOGAN. Mr. Chairman, if the gentleman believes what he said, which I am sure he does, he should support the Hogan amendment [impeachment by any prior felony and by misdemeanors involving dishonesty or false statement] rather than the committee version [impeachment only by crimes involving dishonesty or false statement] or the substitute [*Luck* approach; for further detail on the different proposals before the House, *see* text following note 24 *supra*]. I agree with him precisely.

Mr. DANIELSON. Mr. Chairman, I am glad we are in agreement. I just feel it is unnecessary to go that far, because I think the form the committee has brought out covers the field adequately. Unless we so stultify the meaning of "dishonesty" that it is limited to false statements, we have covered everything we need to do in this particular case.

Mr. DENNIS. Mr. Chairman, will the gentleman yield?

Mr. DANIELSON. Mr. Chairman, I yield to the gentleman from Indiana.

Mr. DENNIS. Mr. Chairman, I would agree with my friend that dishonesty is a bit broader than false statement, but I would not agree that it covers such things as crimes of violence. What we are getting at here is crimen falsi, in the technical language, perjury, false pretense, fraud, and perhaps some other things.

Mr. DANIELSON. Moral turpitude.

Mr. DENNIS. It goes to one's honesty and one's credibility, and it does not cover the waterfront on all crimes for which a person can be sent to jail in excess of a year such as my friend from Maryland (Mr. HOGAN) wants to do.

Mr. DANIELSON. Mr. Chairman, I am pleased to agree with the gentleman from Indiana that it involves that which shall be generally regarded as a dishonest act.

Mr. HOGAN. Mr. Chairman, will the gentleman yield?

Mr. DANIELSON. Mr. Chairman, I yield to the gentleman from Maryland.

Mr. HOGAN. Mr. Chairman, the courts have not borne out the gentleman's interpretation of what is dishonesty. The courts have sometimes rejected under this same guideline robbery, theft, and many other crimes that under the gentleman's definition would be considered "dishonesty."

Mr. DANIELSON. Mr. Chairman, I submit that, if the gentleman please, with the courts aided by this colloquy on the floor as to what the Congress means when it says "dishonesty," they will be able to apply the rule correctly.

*Id.* at 555–56. For a slightly later manifestation of the dispute between Congressmen Hogan and Dennis, *see* Rules of Evidence, Hearings on H.R. 5463 Before the Senate Committee on the Judiciary, 93d Cong., 2d Sess. 13, 15–18 (1974).

Difficulty in interpreting the legislative history of Rule 609(a)(2) is magnified by the fact that identical language in the District of Columbia Court Reform and Criminal Procedure Act of 1970, D.C.Code § 14–305(b)(1)(B) (1973), received a different gloss in the House Committee Report which accompanied that statute. The Report of the Committee on the District of Columbia stated,

> The offenses which involve dishonesty or false statement and which may be used in the discretion of the cross-examining party include, but are not limited to, any offense involving fraud, or intent to defraud, larceny, robbery; rape; false pretenses, forgery, uttering, embezzlement, housebreaking, or burglary; receiving stolen property, sales of narcotic and depressant and stimulant drugs; unauthorized use of a motor vehicle; taking property without right; procuring; or

> any attempt to commit or any assault with intent to commit any of the above offenses. . . . It is the intent of your Committee that the offenses which are excluded from use are primarily those of passion and short temper, such as assault.

H.R.Rep. No. 91–907, 91st Cong., 2d Sess. 62 (1970) (citations omitted). For cases implementing the D.C.Code provisions, *see, e.g., United States v. Belt,* 514 F.2d 837, 841 & n.8 (D.C.Cir. 1975) (no question raised about admissibility of misdemeanor conviction for petty larceny; Government conceded that admission of misdemeanor assault conviction was error); *Williams v. United States,* 337 A.2d 772, 775–76 (D.C.App.1975) (misdemeanor conviction for carrying a pistol without a license admissible); *Durant v. United States,* 292 A.2d 157, 160–61 (D.C. App.1972), *cert. denied,* 409 U.S. 1127, 93 S.Ct. 946, 35 L.Ed.2d 259 (1973) (misdemeanor conviction for unlawful possession of narcotics admissible).

Of course, by virtue of the blanket admissibility of prior *felony* convictions under the D.C.Code, the committee commentary reproduced above has considerably less practical significance than the contrasting annotation contained in the Conference Report on the Federal Rules of Evidence (*quoted in text* preceding note 26). Judicial adherence to the 1970 House Committee Report results only in broader availability of misdemeanor convictions for impeachment purposes. One need not minimize the potential dangers associated with prosecutorial introduction of prior *misdemeanor* convictions, in order to appreciate that such tactics typically do not represent a threat of prejudice as great as that posed by the impeachment use of prior *felony* convictions.