**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Sally A. PAPIA, Russell J. Enea, Joseph V. Basile, and Maximillion J. Adonnis,
Defendants-Appellants.**

**Nos. 76–1420 to 76–1422 and 76–1492.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 5, 1976.

Decided Aug. 19, 1977.

Rehearing and Rehearing En Banc
Denied Nov. 3, 1977.

Thomas P. Doherty, Frank J. Schiro, Joseph P. Balistrieri, Franklyn M. Gimbel, Milwaukee, Wis., for defendants-appellants.

William J. Mulligan, U. S. Atty., David B. Bukey, Atty., Milwaukee, Wis., for plaintiff-appellee.

Before BAUER and WOOD, Circuit Judges, and DILLIN, District Judge.*

---

* The Hon. S. Hugh Dillin, United States District Court for the Southern District of Indiana, is sitting by designation.

BAUER, Circuit Judge.

Codefendants Russell Enea, Joseph Basile and Maximillion Adonnis appeal their convictions for conspiring to use extortionate means to collect a debt in violation of 18 U.S.C. § 894. Sally Papia, who was acquitted on a like conspiracy charge, appeals her conviction for having attempted to collect a debt through extortionate means.

On appeal, all the defendants argue that insufficient evidence exists to support their convictions, that the trial court erred in admitting statements of co-conspirators against them, and that they should have been tried separately. Additionally, Papia argues that the conspiracy and extortion counts brought against her should have been tried separately, that her acquittal on the conspiracy count requires that she be given a new trial on the extortion count, and that the jury was improperly instructed. Enea argues that the trial court erred in failing to respond properly to a question from the retired jury, and that the jury should not have been given transcripts of taped conversations played at trial. Basile argues that he should have been granted a mistrial because of the Government's improper inquiry into his prior theft conviction. Adonnis argues that the trial court erred in permitting a government witness to testify against him in rebuttal. We find all of the defendants' contentions to be without merit and affirm their convictions for the reasons noted below.

I.

Defendants' convictions result from their efforts to collect a debt owed by Kurt Amidzich to Sally Papia. Amidzich had borrowed about $5,000 from Papia while he was employed as a chef at her restaurant. When Amidzich left Papia's employ to open a rival restaurant in partnership with Richard Schmitz and others, Papia was so aggrieved that she insisted that Amidzich repay his debt immediately and told him, "I ought to have your head busted."

A week after the new restaurant, the Northbrook Inn, opened for business, Papia, Enea and James Jennaro visited the establishment. While alone at the bar with Schmitz, Papia complained to Schmitz that he had stolen her chef away. After advising Schmitz that Amidzich owed her $5,000, Papia warned him that

"People have gotten hurt by not showing respect . . . . People that operate or do things such as what you have done to me, Dick, can have problems in business. . . . You could come out here some morning and this place could be burned down."

Papia then told Schmitz that she was holding him personally responsible for seeing that Amidzich's debt was repaid and that, "if you see it's paid, everything will be all right. We can be friends."

Schmitz later related this conversation to Amidzich, who told Schmitz not to worry because the matter would be taken care of. Amidzich then sent Papia a letter, in which he wrote:

"During your recent visit you leaned on Dick pretty good. Some of the things you said upset him and caused him great concern. I've got enough problems as it is and I would consider it a personal favor if you would lay off the muscle."

Papia responded to the letter with a telephone call, in which she told Amidzich to come up with the money or, if he could not, have his partners do it.

During the next two months, Papia made several efforts to collect the debt, including an attempt to force payment by taking possession of Amidzich's automobile. The debt, however, was never paid by Amidzich or his partners in the Northbrook Inn, and the car was returned after Amidzich complained to the authorities.

On December 29, 1974, Joseph Basile called Jacob Schlechter, an unindicted co-conspirator, and instructed Schlechter to set the Northbrook Inn on fire that night. Schlechter did so in the company of his wife, who later contacted the police and began supplying information concerning the ongoing conspiracy. Following the fire, Schlechter went to Basile's home to collect money for his work. Basile gave Schlechter

$100 and told him that another $900 would be forthcoming from out of town. Schlechter asked what the fire was all about, and Basile told him that it was ordered because Amidzich had "screwed over" Sally Papia and because of a "personal grievance" Basile had against Amidzich.

On New Year's Eve, two days after the fire, Papia ran into Amidzich at a local restaurant. Dropping a lighted match into an ash tray, Papia said, "I told you this was going to happen."

In early January, Schlechter asked Basile for the balance of the money due him for setting the fire. Basile deflected the request by advising Schlechter that they were getting pressure from a Frank Balistrieri, who had lost some juke boxes in the Northbrook Inn fire, and that Schlechter should not tell anyone of his involvement in the fire.

On January 7, Russell Enea approached Schlechter in Papia's restaurant and asked him if he knew anything about the fire. Schlechter, complying with Basile's order to keep mum, said that he did not. Three days later, apparently satisfied that Schlechter could be trusted, Enea again approached Schlechter and directed him to break Amidzich's wrists "so he never cooks again." Enea said that "Max" would get in touch with Schlechter to talk about the job. Shortly thereafter, Max Adonnis contacted Schlechter and told him to kidnap Amidzich and take him to a garage so that Adonnis and Enea could break his wrists personally. Schlechter and Adonnis then discussed the plan with Herbert Holland, who was to assist in the endeavor. Adonnis explained to Schlechter and Holland that Amidzich owed Sally Papia $5,000, that he had "screwed over Sally," and that he wasn't going to get away with it. Adonnis gave Schlechter a slip of paper listing Amidzich's address, the make of his car and its license plate number. A week later, Adonnis passed along a photo of Amidzich taken in Papia's restaurant on which Papia's handwriting appeared.

During the next couple of weeks, Holland, Schlechter and Adonnis attempted to locate Amidzich without success. On January 18, Enea, disturbed by the lack of progress, approached Schlechter and, gesturing with his wrists, inquired what Schlechter was doing about Amidzich. Schlechter and Holland renewed their efforts to locate Amidzich but failed to do so, much to the expressed chagrin of Enea and Adonnis. Finally, Adonnis saw Amidzich at a local restaurant and obtained his new address, place of employment and license plate number, which information he passed on to Schlechter with instructions to do the job right away.

After purchasing a baseball bat and two ski masks for use in the battery, Schlechter and Holland went to Amidzich's place of employment in the early morning hours of February 9, 1975. While waiting for Amidzich to leave work, the two were confronted by police because the auto in which they were riding matched a description of a stolen car. Apparently shaken by the incident, Schlechter and Holland decided to go home and contact Adonnis, who advised them to halt their efforts while he checked out possible problems with the police.

On February 14, Schlechter and Holland were arrested on state charges unrelated to the case at bar. The baseball bat, ski masks, and the slip of paper listing Amidzich's address and license plate number were found in Schlechter's possession at the time of his arrest.

That same evening, Enea visited Amidzich at work and told him:

"You know by fate last week you were saved. . . . You were going to see your own blood and they were going to break both your wrists so you would never be able to cook again. . . . They missed you and I'm going to do it personally."

While awaiting trial on the state charges, Schlechter agreed to cooperate with authorities investigating the Northbrook Inn fire and to meet with his co-conspirators while equipped with a hidden tape recorder. On March 6, Schlechter taped a conversation with Adonnis, who told Schlechter of the

efforts he and Enea had made to raise bail money for him. Schlechter asked Adonnis if "that thing" with Amidzich was still on. Adonnis replied, "Right now it's gonna be very, very cool" because he had been told by a police informant that they were all under investigation. When Schlechter asked whether Enea was going to come up with some money for him, Adonnis replied that Enea was trying to work something out and hoping that "when things calm down a bit, maybe you will make another move." Schlechter then asked if "Sally got wind of all this." Adonnis responded that "all she knows is that the two of us got somebody." Adonnis reassured Schlechter, however, that Papia would learn of his efforts: "You're doing it for her. When it gets done, she'll know cause she's gonna pay you."

On March 12, Schlechter taped a conversation with Basile, who admitted that he "took the rap" for the Northbrook Inn fire when confronted by an upset Frank Balistrieri, who wanted to know why Basile had the place burned down without telling him. During the conversation with Schlechter, Basile also admitted that he and Enea had agreed to burn the Northbrook Inn down:

"I said [to Enea], I'd like to burn that place down. I never liked [Amidzich] to begin with, that's what I told him. He said, OK, why don't we do that then. I said, I got to have some expense money."

Moreover, Basile acknowledged that Enea had checked with him before directing Schlechter to kidnap and assault Amidzich:

"Oh, I know, you were supposed to get Kurt. . . . You don't think he [Enea] was gonna send [unintelligible] without them telling me, do ya? You know what he wanted to know: if you could do the job. I said 'he can do the job.' He asked me, How stand up is he? I says he's probably one of the best [expletive deleted] guys around you'll meet in a long time. I says not only that, I says he'll get the job done."

On March 26, Schlechter taped a conversation with Enea in which Schlechter asked if he would get any money for his efforts in trying to assault Amidzich. Enea replied that "nothing was done." Schlechter protested, "Yeah, but time was invested in it." Enea responded, "We would have already had him if you wouldn't have gotten outta line, you. . . . Well, stay in touch with Max, ya know, in case I gotta get hold of ya."

On April 25, after the indictment was returned in this case, Max Adonnis and Sally Papia met with a Mark Gary, who testified at trial that Papia had offered him $5,000 to murder Amidzich and Schmitz, saying: "I want to get rid of them. I want them dead. . . . I'll give you . . $5,000 if you'd kill them."

## II.

Having summarized the evidence presented at trial in the light most favorable to the Government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we turn to the defendants' contentions that the evidence was insufficient as a matter of law to support their convictions.

■ We have no doubt that the evidence fully supported Papia's conviction for attempting to collect a debt through extortionate means. Even excluding the statements of her codefendants linking Papia to the plot to assault Amidzich after the Northbrook Inn fire, the direct testimony elicited from Schmitz was in itself sufficient to support Papia's conviction as a matter of law. On the basis of Schmitz's testimony that Papia threatened harm to him and his business unless he saw to it that Amidzich repaid his debt, the jury could reasonably have concluded that Papia was guilty beyond a reasonable doubt of attempting to collect a debt through extortionate means.

■ As to the other defendants, we believe the evidence supporting their convictions for conspiring to use extortionate means to collect a debt is overwhelming. There can be no doubt that Adonnis, Enea and Basile conspired with Schlechter to burn down the Northbrook Inn and to kidnap and assault Amidzich. Defendants pro-

test, however, that there is no proof that they conspired with the intent to extort payment of the debt or to punish Amidzich for failure to repay it. We disagree. Mindful of our duty to strictly scrutinize the sufficiency of the nonhearsay evidence establishing the conspiracy's existence and linking each defendant to it, *United States v. Buschman*, 527 F.2d 1082, 1084–85 (7th Cir. 1976), we believe the statements of the defendants themselves construed in light of other facts and circumstances of record amply support the jury's finding that each of the conspirators knew of the debt and conspired to punish Amidzich, at least in part, for his failure to pay it.[1]

### III.

 Defendants next contend that the trial court erred in admitting tape recorded conversations between Jacob Schlechter and three of the defendants against all of them under the co-conspirator exception to the hearsay rule set out in Rule 801(d)(2)(E) of the Federal Rules of Evidence. We believe there was more than sufficient independent evidence linking each of the defendants to the conspiracy charged to support use of the tapes against them all. We turn, therefore, to the defendants' principal ground of attack—that the tapes were not made during the course and in furtherance of the conspiracy, which allegedly ended with Schlechter's arrest, before the conversations were recorded.

We note at the outset that the question of the admissibility of the tapes against defendants not present when the conversations took place was extensively litigated in the district court. The trial judge conscientiously reviewed the contents of the tapes and determined that six of the seven tapes offered by the Government contained statements made during the course and in furtherance of the conspiracy charged. We do not believe the judge erred in so finding.

It is clear that a co-conspirator's arrest does not in itself terminate a conspiracy as a matter of law, for the conspirators may remain fully capable of carrying out their purpose, notwithstanding the arrest of one of their cohorts, *United States v. Grubb*, 527 F.2d 1107, 1109 (4th Cir. 1975); *United States v. Thompson*, 476 F.2d 1196, 1200–01 (7th Cir.), *cert. denied*, 414 U.S. 918, 94 S.Ct. 214, 38 L.Ed.2d 154 (1973). Here, though Schlechter's arrest on state charges unrelated to this case and his agreement to cooperate with authorities investigating the Northbrook Inn fire may have effectively ended his participation in the conspiracy,[2] the tapes themselves, as well as other acts and declarations of the conspirators made after Schlechter's arrest, clearly reveal that the defendants retained both the will and the capacity to punish Amidzich for his failure to pay his debt. To be sure, effectuation of the conspiratorial purpose had to be postponed while the "heat" was on. Nevertheless, the evidence established that the conspiracy remained alive and the defendants remained prepared to strike when a safe opportunity presented itself. As Adonnis stated to Schlechter on March 6, "When [the job] gets done, [Papia will] know, cause she's gonna pay you." We believe that the district court's factual find-

---

1. Indeed, Adonnis made the conspirators' intent clear when, during the course and in furtherance of the conspiracy, he instructed Schlechter and Holland to break Amidzich's wrists because Amidzich owed Papia $5,000, had "screwed [her] over," and wasn't going to get away with it. Basile likewise told Schlechter that the Northbrook Inn fire was ordered in part because Amidzich had "screwed over" Sally. Enea, who admitted knowing of the Amidzich-Papia debt and being bothered by Amidzich's failure to repay it, told a fellow employee of Papia's restaurant on the morning after the fire that Amidzich "deserved what he's got." We reject out of hand the defend-

ants' arguments that the above statements are too ambiguous to support a reasonable inference of their intent even when the statements are considered in light of the totality of the evidence presented at trial.

2. No statements made by Schlechter following his arrest and agreement to cooperate were used against the defendants at trial. The statements of Schlechter to his wife that were admitted against his co-conspirators were made during the course of his participation in the conspiracy and, notwithstanding Enea's argument to the contrary, were made in furtherance of the conspiracy.

ings that the statements at issue were made during the course and in furtherance of the conspiracy was fully justified by the evidence, and that the court did not err in admitting the tapes against each of the defendants.[3]

## IV.

Defendants next contend that the trial court erred in denying their respective motions for severance. Generally the defendants claim that the possibility of jury confusion and inability to give separate consideration to the evidence admitted against each of them was so great that severance was essential to a fair trial. Apart from these common arguments of prejudice, Papia claims that severance was warranted as to her because she was denied the opportunity to obtain exculpatory testimony from Adonnis at trial. Basile, Enea and Adonnis also contend that *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969), *cert. denied*, 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1971), mandated their severance because of

the fatal variance between the indictment, which charged a single conspiracy, and the proof presented at trial, which suggested that there were two separate conspiracies. We address the defendants' arguments in turn.

## A.

■ It is well settled that motions for severance are committed to the sound discretion of the trial court, and that the court's ruling thereon will not be overturned on appeal absent a clear abuse of discretion. *Opper v. United States*, 348 U.S. 84, 94–95, 75 S.Ct. 158, 99 L.Ed. 101 (1954). To be entitled to a severance a defendant must show that he will be unable to obtain a fair trial without severance, not merely that a separate trial would offer him a better chance of acquittal. *United States v. Abraham*, 541 F.2d 1234, 1240 (7th Cir. 1976). Moreover, in considering a motion for severance, the trial judge should give due deference to the strong public

3. Our conclusion that the extrajudicial statements made by the defendants in the recorded conversations were admissible against all of the defendants under Rule 801(d)(2)(E) also disposes of Papia's and Enea's claim that they were denied their Sixth Amendment right of confrontation by the Government's use of Adonnis's statements implicating them in the plot to kidnap and assault Amidzich.

Papia and Enea argue that Adonnis's failure to take the stand at trial deprived them of an opportunity to rebut his assertion that they were involved in the efforts to assault Amidzich. They say that the relevant confrontation clause inquiry is whether, in the circumstances of this case, the unavailability of Adonnis deprived the jury of a satisfactory basis for evaluating the reliability of his extrajudicial declarations used against them. *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *United States v. Puco*, 476 F.2d 1099, 1103 (9th Cir.), *cert. denied*, 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973). We disagree.

We believe that, implicit in the result reached by the Court as a whole in *Dutton*, and in the language of Justice Stewart's plurality opinion, is the conclusion that the confrontation clause presents no bar to the use of extrajudicial statements of a co-conspirator admissible under Rule 801(d)(2)(E) of the Federal Rules of Evidence. See 400 U.S. at 80, 91 S.Ct. 210. That, at least, is the settled law of this Circuit. *United States v. Isaacs*, 493 F.2d 1124, 1161

(7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *United States v. Cogwell*, 486 F.2d 823, 832–35 (7th Cir. 1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974); *Howell v. United States*, 300 F.Supp. 1017 (N.D.Ill.1969), *aff'd*, 442 F.2d 265 (7th Cir. 1971). As we said in *Isaccs, supra* at 1161, "the community of interest of the conspirators evidences likelihood of reliability." Papia and Enea would have us reassess the reliability of extrajudicial statements of a co-conspirator made during the course and in furtherance of a conspiracy on a statement-by-statement and case-by-case basis. We decline to do so. *Isaacs* and other decisions of this and sister courts mandates a per se rule permitting the use of properly admissible extrajudicial statements of a co-conspirator who does not take the stand at trial without risk of a reversal for violation of his codefendants' rights to confrontation. Accord, *Ottomano v. United States*, 468 F.2d 269, 273 (1st Cir. 1972), *cert. denied*, 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973); *United States v. Cox*, 449 F.2d 679, 688–89 (10th Cir. 1971), *cert. denied*, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972). But see *United States v. Kelley*, 526 F.2d 615, 620–21 (8th Cir. 1975), *cert. denied*, 424 U.S. 971, 96 S.Ct. 1471, 47 L.Ed.2d 739 (1976); *United States v. Snow*, 521 F.2d 730, 734–36 (9th Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976).

interest in having persons jointly indicted tried together, particularly where, as here, a conspiracy is charged and may be proved by evidence that arises out of the same act or series of acts. *United States v. Echeles*, 352 F.2d 892, 896–97 (7th Cir. 1965). Other less drastic alternatives to severance of defendants should be explored first. E. g., *United States v. Kahaner*, 203 F.Supp. 78, 80–83 (S.D.N.Y.1962) (Weinfeld, J.), *aff'd*, 317 F.2d 459 (2d Cir.), *cert. denied*, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963). Ultimately the question is whether, under the circumstances of the particular case, a properly instructed jury can follow the court's limiting instructions and assess each defendant's guilt or innocence solely on the basis of the evidence admissible against him.

Viewed in light of the above principles, we believe the defendants' generic arguments of prejudice based on the possibility that the jury could have become confused and reached their verdicts on the basis of guilt by association must be rejected. The very fact that Papia, an alleged ringleader of the conspiracy, was acquitted shows that the jury was able to give separate consideration to each defendant. Moreover, as we will take up in greater detail later, the jurors were properly instructed throughout the trial and apparently took the court's instructions seriously. As the Supreme Court stated in an analogous case,

> "To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions. There is nothing in this record to call for reversal because of any confusion or injustice arising from the joint trial." *Opper v. United States, supra* at 95, 75 S.Ct. at 165.

### B.

We turn next to Papia's argument that severance was warranted as to her because she was deprived of the exculpatory testimony of one of her codefendants. In support of Papia's motion for a pretrial severance, Max Adonnis testified that he would testify on Papia's behalf at a separate trial but would not do so if tried with her. Furthermore, he stated that, if called at a separate trial, he would testify (1) that he never had any conversation with Papia about the Northbrook Inn fire, (2) that he never discussed with Papia the debt owed by Amidzich, (3) that he was unaware of any relationship between Papia and Schlechter and Holland, (4) that Papia never offered him any money to collect the Amidzich debt, and (5) that he was not aware that Papia had offered anyone else money to assist in collecting the debt. Papia, relying on *United States v. Echeles*, 352 F.2d 892 (7th Cir. 1965), claims that the district court should have granted her motion for a severance once she established that Adonnis would give exculpatory testimony at a separate trial.

Even assuming *arguendo* that Adonnis would have testified on Papia's behalf at a separate trial,[4] we do not believe that Papia was denied a fair trial because of his unavailability.

The jury, of course, has mooted the question of whether Adonnis's potential testimony was sufficiently exculpatory in character to entitle Papia to a separate trial on the conspiracy count brought against her. Compare *United States v. Echeles, supra* at 897, with *United States v. Harris*, 542 F.2d 1283, 1311–13 (7th Cir. 1976), and *United States v. Abraham*, 541 F.2d 1234, 1239–40 (7th Cir. 1976). All that remains for us to determine is whether Papia suffered actual prejudice to her defense to the substantive extortion count by reason of her inability to obtain Adonnis's testimony at trial. We conclude that she did not, for his testimony would not in any manner have tended to exculpate her from the charge of attempting to collect a debt through threats of

---

4. As was made clear during a conference between the court and counsel at trial, Adonnis's position was that he would not testify on Papia's behalf until his guilt or innocence on pending state and federal charges were completely resolved.

838

violence. That charge, unlike the conspiracy charge, did not rest on Papia's involvement with her codefendants, but rather on testimony of what Papia told Schmitz at the Northbrook Inn on October 21, a matter on which Adonnis had no knowledge whatsoever. Because Adonnis's testimony could not have affected the jury's consideration of the charge upon which Papia stands convicted, we do not believe the district court's denial of her pretrial and subsequent motions for severance denied her a fair trial by depriving her of dramatically exculpatory testimony.

### C.

Defendants next argue that an allegedly fatal variance between the single conspiracy charged in the indictment and the separate conspiracies proved by the evidence presented at trial mandated their midtrial severance. They rely on *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969), *cert. denied*, 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1971), to support their conclusion that, once the trial judge determined that he was obliged to instruct the jury as to the possibility of finding multiple conspiracies, he was required to grant the defendants' motions for severance to prevent the jury from considering extrajudicial statements made in furtherance of one conspiracy as evidence of the defendants' involvement in the other conspiracy.

This argument might have some validity if, in fact, a fatal variance had arisen between the evidence presented at trial and the single conspiracy charged in the indictment. Where the evidence *requires* a finding of separate conspiracies because it is insufficient as a matter of law to support the existence of the single conspiracy charged, a midtrial severance may conceivably be the only effective remedy available to prevent prejudice resulting from the spillover of hearsay across the lines separating the multiple conspiracies established by the evidence. However, such an extreme remedy, predicated on the futility of appropriate limiting instructions in the circumstances of the particular case, should be

reserved for those extreme cases in which no reasonable jury could find on the basis of the evidence that the defendants were engaged in a single conspiracy. This is not such a case.

We believe the evidence presented at trial was completely consistent with the Government's theory of prosecution that a single conspiracy executed through separate overt acts existed, and the evidence was clearly sufficient to support such a finding. Defendants appear to labor under the misapprehension that, simply because the trial judge instructed the jury on the *possibility* of finding multiple conspiracies, he must necessarily have determined that the evidence would support no other finding. In fact, the record makes clear the trial judge believed that the Government had proved the single conspiracy it charged and appears to have given multiple-conspiracy cautionary instructions only because there was "some foundation in the evidence," however weak, to support giving them as theory-of-defense instructions. *United States v. Hillsman*, 522 F.2d 454, 459 (7th Cir.), *cert. denied*, 423 U.S. 1035, 96 S.Ct. 570, 46 L.Ed.2d 410 (1975). This case was no different from the ordinary conspiracy case in which a reasonable possibility of a variance arises. In such a case, *Varelli* teaches that "the district judge should *not* grant a severance . . . but should instruct the jury on multiple conspiracies" when the defense so requests. 407 F.2d at 746 (emphasis added). Reading *Varelli* as requiring a midtrial severance in lieu of multiple-conspiracy cautionary instructions whenever a reasonable possibility of a variance exists would stand the case on its head. We find no error in the trial judge's refusing to grant the defendants' motions for midtrial severance because of the mere possibility of a variance between the crime charged and the proof presented in support thereof.

### D.

A corollary *Varelli*-based argument Enea advances, however, deserves more attention. He concedes that the trial judge gave proper multiple-conspiracy cautionary in-

structions at the end of trial, but argues that the judge erred in not giving them sooner so as to condition the jury to its duty to segregate evidence bearing on the defendants' participation in one conspiracy from evidence relating to their involvement in the other conspiracy. In support of his argument, Enea relies on *Varelli* for the proposition that, "when the possibility of a variance appears, [the trial judge] should instruct the jury on multiple conspiracies," 407 F.2d at 746, and on *United States v. Apollo*, 476 F.2d 156, 163 (5th Cir. 1973), for the proposition that cautionary instructions advising the jury of its duty to determine each defendant's participation in the conspiracy on the basis of his own acts and statements before using the hearsay declarations of his co-conspirators against him "must be given either prior to the introduction of any evidence or immediately upon the first instance of such hearsay testimony." Reading *Varelli* and *Apollo* together, Enea says that, *as soon as* sufficient evidence is presented at trial to suggest the possibility of a variance, the trial judge *must* instruct the jury on a multiple-conspiracy theory and inform the jury of its duty not to use extrajudicial statements in furtherance of one conspiracy as evidence of the declarant's or his codefendant's involvement in another conspiracy. Enea contends that, absent such jury conditioning in the course of trial, severance is mandatory, for even proper multiple-conspiracy cautionary instructions given at the end of trial will be unable to protect the defendants from the "dangers of transference of guilt . . . across the line separating the two conspiracies." *Kotteakos v. United States*, 328 U.S. 750, 774, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1948). We disagree.

■ We note at the outset that, so far as it appears from our review of the record, neither Enea nor any other defendant ever moved to have a jury instructed on multiple conspiracies in the course of the trial.[5] This alone precludes a finding of error on appeal, unless we can say that the trial judge's failure to give multiple-conspiracy cautionary instructions sua sponte in the course of the trial constituted plain error affecting the substantial rights of the defendants. Fed.R.Crim.P. 52(b). We decline to so hold.

■ To be sure, *Apollo* holds that a trial judge commits plain error by not instructing the jurors in the course of trial as to their duty not to use the extrajudicial statements of a defendant to establish any codefendant's membership in the conspiracy charged. Because *Apollo* is predicated on the view of the Fifth Circuit that appropriate limiting instructions given at the end of trial are insufficient to protect the defendants from prejudicial transference of guilt from one defendant to another, we recognize that its reasoning is applicable by analogy here, even though *Apollo* does not speak to the appropriate timing of multiple-conspiracy limiting instructions.

Enea's reliance on *Apollo*, however, is misplaced, for we have recently declined to adopt the *Apollo* rule for this Circuit. In *United States v. Buschman*, 527 F.2d 1082, 1085–90 (7th Cir. 1976), we reviewed the state of the law governing the appropriate timing of instructions limiting the use of extrajudicial statements of a co-conspirator and decided to adhere to our own view in *United States v. Halpin*, 374 F.2d 493, 495–96 (7th Cir.), *cert. denied*, 386 U.S. 1032, 87 S.Ct. 1482, 18 L.Ed.2d 594 (1967), that limiting instructions given at the end of trial would be sufficient to protect the defendants from prejudice. Admittedly, we noted in *Buschman* that

"in most cases the trial court would be well advised, particularly when appropri-

---

5. We inquired at oral argument whether such a motion was made or instruction tendered. Counsel stated that he believed such an instruction was tendered during trial but was unable to direct our attention to any portion of the record verifying his recollection. On the basis of counsel's representation, we searched the record and discovered that multiple-conspiracy cautionary instructions had indeed been tendered during trial, but only as part of the final instructions proposed to the court for use at the end of trial. So far as we have been able to ascertain, no motion was made or instruction tendered for use during trial. We invite counsel's comments on this matter should a petition for rehearing be filed.

ate request has been made, to make it clear at the outset to the jury that the hearsay testimony . . . was being heard . . . on the conditional basis that the defendant must be shown by independent nonhearsay evidence to have been at the pertinent times either a joint venturer or a co-conspirator." 527 F.2d at 1089.

Nevertheless, we declined to hold that it is per se an abuse of discretion or plain error not to give such an instruction in the course of trial.

 What we said in *Buschman* concerning the desirability of leaving the timing of hearsay limiting instructions to the sound discretion of the trial judge applies with full force to the timing of the multiple-conspiracy limiting instructions sought here. The conditional admissibility of extrajudicial statements of a conspirator is a subtle enough concept for lay jurors to grasp that a trial judge may have good reason to believe that instructing the jurors during trial as to their duty to apply that concept across the lines of multiple conspiracies—*should* they find such exist—may simply add to the jurors' confusion and deflect their attention from the evidence being presented at trial. Moreover, it frequently may be difficult, if not impossible, to isolate the precise point in the course of trial at which the evidence has become sufficient to support theory-of-defense instructions on multiple conspiracies, even though the evidence also may be sufficient to support a finding of the single conspiracy charged. Trial judges have enough to worry about in the course of a multi-defendant, multi-count conspiracy case without being saddled with a plain error rule requiring them to isolate the elusive point in the course of trial at which the reasonable possibility of a variance requiring a *Varelli*

multiple-conspiracy instruction appears. We hold that it was not plain error for the trial judge not to instruct the jury during trial on the possibility of finding multiple conspiracies.[6]

## V.

We turn next to Papia's claims that the district court erred (1) in denying her request that the two counts against her be tried separately, (2) in refusing to grant her a new trial on the extortion count after her acquittal on the conspiracy count, and (3) in refusing to instruct the jury not to consider the extrajudicial statements of her codefendants and the events occurring after her conversation with Schmitz at the Northbrook Inn in determining her guilt or innocence on the extortion count. We find her contentions to be without merit for the reasons noted below.

## A.

 Papia's claim that the district court erred in denying her pretrial motion for severance of counts does not warrant extensive comment. Severance of counts under Rule 14 of the Federal Rules of Criminal Procedure is discretionary, and a trial judge's refusal to grant severance will cause reversal on appeal only if there has been a clear abuse of discretion. *United States v. Pacente*, 503 F.2d 543, 546 (7th Cir.) (en banc), *cert. denied*, 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642 (1974). We cannot say that

"the facts and law presented to the trial judge at the time of the motion for severance demonstrated that a trial under joinder was likely to be unfair and that the trial was in fact unfair." *United States v. Kahn*, 381 F.2d 824, 841 (7th

---

**6.** Even if our assumption that no multiple-conspiracy instruction was tendered for use during trial is incorrect, we would find it difficult, in light of *Buschman* and *Halpin*, to hold that Enea suffered any prejudice because of the judge's refusal to give the instruction during trial. As Enea concedes, the multiple-conspiracy cautionary instructions given at the end of trial were correct. Moreover, the trial judge did admonish the jury during trial to consider only the acts and statements of each defendant in determining his membership in the conspiracy charged. Under the circumstances, we entertain little doubt that the jurors were able to apply the instruction across the lines of the possible multiple conspiracies on which they were properly instructed at the end of trial.

Cir.), *cert. denied,* 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967).

Accordingly, we find no abuse of discretion in the trial court's denial of Papia's pretrial motion for severance of counts, and, for the reasons noted in Judge Reynold's post-trial ruling on this same claim, we agree that she suffered no prejudice because of the joinder of counts:

> "Even with the benefit of hindsight, it cannot be said that joinder [of counts] prevented the evidence from being separately considered. The jury was painstakingly instructed on the use of the hearsay testimony and was reminded both by the Court orally and by use of separate verdicts that each count was to be considered separately on the evidence relating to that count. Its deliberations were aided by the rereading of the Court's instructions and the testimony of Richard Schmitz. The proof was distinct with respect to each count. There is nothing in the record to suggest that defendant Papia did not receive fair consideration on each count." *United States v. Papia,* 409 F.Supp. 1307, 1314 (E.D.Wis. 1976).

### B.

■ Because we are convinced that Papia suffered no actual prejudice due to the joinder of counts, we also reject her claim that the district court should have awarded her a new trial on the substantive count because of her acquittal on the conspiracy count. Relying on *United States v. Craig,* 522 F.2d 29 (6th Cir. 1975), *United States v. Lucido,* 486 F.2d 868 (6th Cir. 1973), and *United States v. Johnson,* 334 F.Supp. 982 (W.D.Mo.1971), *aff'd,* 462 F.2d 608 (8th Cir.), *cert. denied,* 409 U.S. 952, 93 S.Ct. 299, 34 L.Ed.2d 224 (1972), Papia claims she is entitled to a new trial because extrajudicial statements of her codefendants impermissibly tainted her conviction on the substantive count.

We believe Papia's reliance on the above cases is misplaced. Simply put, in those cases the hearsay evidence presented on the conspiracy count was also the principal portion of the Government's proof of the substantive counts.

Here, in contrast, the evidence presented at trial on the substantive count of which Papia was convicted stood on its own. It was, as the district court noted, separate and distinct from the evidence presented as proof of Papia's involvement in the conspiracy. Papia's claim that extrajudicial statements of her codefendants impermissibly tainted the jury's verdict on the extortion count is pure speculation. The trial judge instructed the jury to give separate consideration to each count and not to consider the extrajudicial statements of Papia's codefendants against her unless they were convinced on the basis of independent evidence of her participation in the conspiracy. Had the jury in fact violated the court's instructions and considered the extrajudicial statements of Papia's codefendants even though there was insufficient independent proof that she was a member of the conspiracy, we entertain no doubt that Papia would have been convicted of conspiracy as well, for, as Papia argues here, the extrajudicial statements of her codefendants powerfully incriminated her and, if believed, conclusively established her participation in the conspiracy. Having apparently been able to follow the court's limiting instruction in acquitting Papia of the conspiracy count, the jury should not be presumed to have rested its verdict on the extortion count on the extrajudicial statements of Papia's codefendants.

Under the circumstances of this case, we have no reason to doubt that the jury followed the court's limiting instructions and gave separate consideration to the evidence presented on the extortion count, as they were told to do. The law presumes that the jury did just that. See *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954). Nothing in this record supports Papia's speculation to the contrary.

### C.

Finally, Papia claims that the district court erred in instructing the jury.

■ First, she complains of a midtrial instruction given the jury at the close of the Government's case, which informed the jury that the conditionally admitted extrajudicial statements of the defendants were admissible and now "may be considered by you against all the defendants."[7] On appeal, Papia complains that the instruction was defective because it failed to limit the admissibility of the evidence to the conspiracy count alone and failed to condition the jurors' use of the evidence on their finding that a conspiracy existed and that Papia was a party to it.

Our review of the record reveals that Papia made no such objections to the court's instruction at the time of trial. When the court gave counsel an opportunity to comment on the propriety of its proposed instruction, the only objections Papia raised were that the effect of the instruction was to tell the jury that the court had already found that a conspiracy existed, and that the timing of the instruction would put undue emphasis on the hearsay portion of the Government's case. Papia has wisely abandoned those objections on appeal, for they have no merit.[8] The objections pressed on appeal to the court's instruction have a "hollow ring" in view of Papia's failure to tender a limiting instruction or at least to specify at trial the grounds of her objections raised here, as required by Rule 51 of the Federal Rules of Criminal Procedure. *United States v. Hollinger,* 553 F.2d 535, 546 (7th Cir. 1977). Treating Papia's appellate objections to the court's instruction as sounding in plain error, we find no merit to her arguments. We believe the extrajudicial statements of Papia's codefendants were admissible against her on both counts in the circumstances of this case, so there was no need to tell the jury to limit its use of those statements to the conspiracy count alone. See, e. g., *United States v. Hoffa,* 349 F.2d 20, 41 (6th Cir. 1965), *aff'd,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States v. Kohne,* 358 F.Supp. 1053, 1059 (W.D.Pa. 1973), *aff'd,* 485 F.2d 682 (3d Cir.), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2624, 41 L.Ed.2d 224 (1974). Nor do we believe that the effect of the court's instruction was to tell the jury to consider the extrajudicial statements of Papia's codefendants against her without any limitation whatsoever. The court simply told the jurors that "you *may* consider" the evidence against all defendants, and the court's prior and subsequent instructions to the jurors informed them that the existence of the conspiracy and Papia's participation in it must be predicated on independent evidence.

■ Second, Papia claims that the district court should have given the following instruction to the jury:

"You are instructed that Count 3 alleges a completed crime on October 21, 1974, and events which occurred after that date cannot be considered by you in determining whether or not the Government has proved beyond a reasonable doubt that Mrs. Papia used extortionate means in her conversation with witnesses."

We believe it would have been error to give the above instruction, for it misstates the law. Subsequent acts, declarations or events may well be both relevant and admissible on the question of whether a defendant has committed the "completed

---

7. The instruction reads in full:

"Ladies and gentlemen of the jury, throughout the trial many objections have been made, and properly so, to admission of certain evidence on the grounds [the] evidence is hearsay, and I have preliminarily admitted that evidence, waiting to the point in trial where I can rule on its admissibility or not. And I wish to advise you that the testimony relating to acts and conversations and statements by the alleged co-conspirators and the defendants outside the presence of the other defendants is admissible and may be considered by you against all defendants, whether or not each was present when the act was done or such conversations were had or the statements were made."

8. Unlike the midtrial instruction found defective in *United States v. Allegretti,* 340 F.2d 243 (7th Cir. 1964), *cert. denied,* 390 U.S. 908, 88 S.Ct. 830, 19 L.Ed.2d 876 (1968), the instruction given in this case did not imply to the jury that the court already had found that a conspiracy existed and that each of the defendants were members of it.

crime" alleged to have occurred on an earlier date. In this case, for example, Mark Gary's testimony that Papia offered him $5,000 to murder the principal witnesses against her was clearly admissible to show her consciousness of guilt and would have been admissible even if Papia had obtained a separate trial of the extortion count. *United States v. Franks,* 511 F.2d 25, 36 (5th Cir.), *cert. denied,* 422 U.S. 1042, 1048, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975); *McCormick on Evidence* § 273(e), at 660–62 (2d ed. 1972). We find no error in the district court's refusal to give the above instruction.

### VI.

We turn now to Enea's arguments that the trial court erred in failing to respond properly to a question submitted by the retired jury and in permitting the jury to be given transcripts of the taped conversations played at trial.

### A.

On the second day of their deliberations, the jurors sent the judge the following question:

"Dear Judge Reynolds, . . . The jurors respectfully request answer to the following question and this question alone: Can someone be guilty of a conspiracy if his acts further the conspiracy and he does these acts for a reason other than furtherance of the conspiracy?"

After consulting with counsel, the trial judge, in accordance with a suggestion of Papia's counsel and over the objection of Enea's counsel, responded:

"I regret that I am not able to answer your question yes or no. But I am willing to read to you again all those questions—I mean all those instructions dealing with the question of whether or not a conspiracy existed if you would like the Court to do that. And I think that I would rather have you go back to the jury room and let us know whether or not, because I want you to have an opportunity to confer if you want the Court to reread to you all the questions—what's

wrong with me, all the instructions on the subject of conspiracy. I will do that. So why don't you go back to the jury room and let us know if that's what you want."

The jury foreman then stated:

"I think we can answer it now, Judge. This is what we want."

Accordingly, the court reread the conspiracy instructions to the jury.

Enea, arguing that the court should have answered the jurors' question with a simple "No," claims the court committed reversible error in failing to clear up the jury's confusion with "concrete accuracy." *Bollenbach v. United States,* 326 U.S. 607, 612–13, 66 S.Ct. 402, 90 L.Ed. 350 (1946). Relying on *United States v. Bolden,* 169 U.S.App.D.C. 60, 514 F.2d 1301, 1308 (1975), and *United States v. Harris,* 388 F.2d 373, 377 (7th Cir. 1967), he argues that rereading portions of the initial charge was an insufficient response to the jury's question.

We agree with the Government that the question posed by the jury was not amenable to an unqualified "Yes" or "No" answer, and that the defendant's reliance on *Bolden* and *Harris* is misplaced.

Generally, the necessity, extent and character of supplementary instructions on the law requested by a jury are matters within the sound discretion of the trial court, and it is not error to respond to an inquiry from the jury by rereading relevant instructions that properly state the law applicable to the case. *United States v. Braverman,* 522 F.2d 218, 224 (7th Cir.), *cert. denied,* 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975). Though the trial judge has a duty to strive conscientiously to clear up any confusion created by his initial charge to the jury, he is not bound to give unqualified answers to specific questions posed by the jury. See *United States v. Joyner,* 494 F.2d 501, 507 (5th Cir.), *cert. denied,* 419 U.S. 995, 95 S.Ct. 308, 42 L.Ed.2d 268 (1974); *United States v. Cleveland,* 477 F.2d 310, 314–15 (7th Cir. 1973). This is particularly true where, as here, an unqualified "Yes" or "No" answer may well mislead the jury.

We believe that under the circumstances presented here an unqualified "Yes" or "No" answer would have been inappropriate. A "Yes" answer would have been called for if the jury found that the defendant had already agreed to join the conspiracy before acting in furtherance of it. A "No" answer would have been called for if the jury found that the defendant had no knowledge of the conspiracy's existence and acted in furtherance of it without intending to do so. On the other hand, a "Yes or No" answer would have been appropriate if the jury found that the defendant knew of the conspiracy and knew that his actions would further the ends of the conspiracy, for the jury could infer or not infer from such knowledge the requisite intent to join the conspiracy. Under the circumstances the court did not err in refusing to give an unqualified "No" answer to the jury's question.

Enea's reliance on *Bolden* and *Harris* for the proposition that it was error simply to reread the relevant instructions to the jury rather than attempt to frame a specific response to the jury's question is misplaced. In those cases, the supplemental charge was deemed inadequate to clear up juror confusion created by the initial charge either because the supplemental charge was simply nonresponsive to the question posed by the jury, or because it did not include pertinent instructions requested by defense counsel.

Here, in contrast, the jury's foreman quickly responded to the court's suggestion that the original instructions be reread with the statement, "This is what we want." There is nothing in the record to suggest, nor is there reason to presume, that the supplemental charge given was unresponsive to the jury's inquiry. The instructions reread to the jury properly stated the applicable law, and counsel were permitted to include any of the initial instructions that they deemed relevant to the jury's inquiry in the supplemental charge, including the following theory-of-defense instruction given earlier at Enea's request:

"If you, the jury find that the actions and declarations of the defendant Enea were the sole product of the personal animosity of Mr. Enea held toward Kurt Amidzich and were not intended for any purpose alleged by the Government then you cannot find the defendant Enea was a member of the conspiracy alleged by the Government."

### B.

Enea next contends that the trial court erred in providing the jury with Government-prepared transcripts of the taped conversations played at trial. He claims that the use of the transcripts in concert with the playing of the tapes was prejudicially cumulative because it placed undue emphasis on the "hearsay" portion of the evidence disproportionate to its probative value. We find no error in the trial court's use of the transcripts.

We note at the outset that the trial court permitted the defendants to compare the Government's transcripts against the tapes, to correct any discrepancies they believed extant, and to prepare their own transcripts for submission to the jury if they so desired. Given the above procedural guarantees of accuracy, we find no error in permitting the jury to use the Government's transcripts as an aid while listening to the tapes played at trial. The transcripts were not introduced into evidence and were not given to the jury for use during their deliberations. Moreover, the trial court specifically instructed the jury that the transcripts were merely an aid, and that the jury's own recollection as to the contents of the tapes was controlling. Under the circumstances, we do not believe the trial court abused its discretion in permitting use of the transcripts for the limited purpose of assisting the jury in following the conversations on the tapes. Accord, *United States v. McMillan,* 508 F.2d 101, 105–06 (8th Cir. 1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975).[9]

9. Enea's alternative argument that the court erred in admitting the tapes into evidence dur-

ing the direct testimony of Schlechter, who participated in each of the conversations taped,

## VII.

 We turn now to Basile's claim that the district court should have declared a mistrial following the Government's allegedly improper inquiry into his past criminal record. The motion for a mistrial was made after the following testimony was elicited from Basile on cross-examination:

"Q. Have you ever been arrested or convicted of a crime?

A. I was convicted of a misdemeanor in Federal Court in February.

Q. What was that—

A. Theft of less than $100.00.

Q. From who?

A. Savings and loan."

Basile contends (1) that it was error to allow the Government to inquire into his prior misdemeanor conviction for purposes of impeachment, and (2) that the Government improperly attempted to delve into the facts and circumstances of the conviction after Basile had admitted its existence.

We have no doubt that, if it was proper for the Government to cross-examine Basile at all about his prior misdemeanor conviction, no error was committed in eliciting from Basile the type of institution from which he stole the money, for the fact that the theft involved a federally insured savings and loan association was an essential element of the federal crime of which Basile was convicted. In asking Basile "From who" [sic] he stole the money, the Government was attempting simply to define what the crime was. Because the Government could have brought out the fact that Basile's theft involved a savings and loan association by introducing the written record of the conviction itself, it was not error to bring that fact out through cross-examination of the witness instead. *United States v. Harding,* 525 F.2d 84, 89–90 (7th Cir. 1975) (Stevens, J.). Accordingly, we hold that the Government did not improperly delve into the facts and circumstances underlying the prior conviction and turn now to the question of whether Basile's prior conviction for theft was admissible at all for purposes of impeachment.

At first blush, the question seems easily resolved. Under Rule 609(a)(2) of the Federal Rules of Evidence, prior misdemeanor convictions may be used to impeach a witness's credibility if, and only if, the prior crime involved "dishonesty or false statement." [10] Beginning with the language of the Rule itself, we note that "dishonesty" is, by definition, a "disposition to lie, cheat, *or steal.*" *Random House College Dictionary* 380 (abr. ed. 1973) (emphasis added). Moreover, "[i]n common human experience, acts of deceit, fraud, cheating *or stealing* . . . are universally regarded as conduct which reflects adversely on a man's *honesty* and integrity." *Gordon v. United States,* 127

---

is without merit. Enea claims that the tapes were "prior consistent" statements within the meaning of Rule 801(d)(1)(B) of the Federal Rules of Evidence improperly admitted to bolster Schlechter's credibility, which had not yet been subject to attack on cross-examination. *United States v. Smith,* 160 U.S.App.D.C. 221, 490 F.2d 789, 792 (1974). Enea concludes that the untimely submission of the tapes created an impregnable curtain of corroborative credibility around Schlechter's direct testimony concerning the conversations in which he participated. We agree, yet we fail to see why it is error to permit the Government to corroborate the testimony of its witness concerning conversations in which the witness engaged by introducing tapes of the conversations themselves. The tapes were not "prior consistent" statements; they were the very statements to which he testified making and hearing others make.

**10.** Any felony conviction, whether or not for a crime involving "dishonesty or false state-

ment," is admissible under 609(a)(1) if the district court determines that its probative value outweighs its prejudicial effect on the defendant. *United States v. Mahone,* 537 F.2d 922, 928–29 (7th Cir. 1976). Felonies or misdemeanors involving "dishonesty or false statement," however, are admissible under 609(a)(2) without regard to the probative value/prejudicial effect balancing test of 609(a)(1). *United States v. Smith,* 551 F.2d 348, 365 (D.C. Cir. 1976); H.R.Rep.No.93–1597, 93rd Cong., 2d Sess. 9, *reprinted in* [1974] U.S.Code Cong. & Admin.News p. 7103. The question remains open, however, whether district courts retain residual discretion under Rule 403 to exclude a prior conviction admissible under Rule 609(a)(2). *Id.* at 358–59 n. 20. See generally, Younger, "Three Essays on Character and Credibility Under the Federal Rules of Evidence," 5 *Hofstra L.Rev.* 7, 11–12 (1976).

U.S.App.D.C. 343, 383 F.2d 936, 940, *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1967) (emphasis added). A common sense approach to the language of Rule 609(a)(2) would support the conclusion that Basile's prior conviction was admissible because theft is a crime involving "dishonesty" within the common meaning of that term.

A different conclusion, however, is suggested when reference is made to the legislative history of Rule 609(a)(2). The Federal Rules of Evidence were the subject of considerable conflict in the Congress, and a focus of much of this conflict was the intended meaning of the terms "dishonesty or false statement" in Rule 609(a)(2). The history of the debate over the meaning of those terms has been fully recounted elsewhere [11] and need not be dwelled on here. For present purposes, it suffices to note that the Conference Committee Report on the legislation finally adopted states:

> "By the phrase 'dishonesty and [sic] false statement' the Conference means crimes such as perjury or subornation of perjury, false statement, criminal fraud, embezzlement or false pretense, or any

other crime in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully." H.R.Conf. Rep.No.93–1597, 93rd Cong., 2d Sess. 9, *reprinted in* [1974] U.S.Code Cong. & Admin.News p. 7103.

Because the crime of larceny or theft is neither enumerated above nor encompassed by the strict meaning of the term "crimen falsi," [12] an inference arises that Congress intended the term "dishonesty" in Rule 609(a)(2) to mean something more than a man's propensity to steal what does not belong to him.

Precisely because of the variance between the common meaning of "dishonesty" and the more restrictive meaning in which Congress apparently used the word, courts have split on the question of whether prior convictions for crimes involving stealing, without more, are admissible for impeachment purposes under Rule 609(a)(2).[13]

As the developing conflict between the Circuits reveals, reasonable men may disagree about whether a witness's propensity

---

**11.** E. g., *United States v. Smith,* 551 F.2d 348, 360–69 (D.C. Cir. 1976).

**12.** In its most limited technical sense, the term "crimen falsi" refers only to crimes of fraud and deceit that adversely affect the administration of justice. *United States v. Smith,* 551 F.2d 348, 362–63 & n.26 (D.C. Cir. 1976); *Matzenbaugh v. People,* 194 Ill. 108, 62 N.E. 546, 548–49 (1901). The term, however, has also been used to refer to any crime perpetrated by means of fraud or deceit. *United States v. Dixon,* 547 F.2d 1079, 1083 n.3 (9th Cir. 1976); *Government of Virgin Islands v. Toto,* 529 F.2d 278, 281 & n.3 (3d Cir. 1976). This appears to be the sense in which the term was used in the Conference Committee Report, although at least one member of the Committee believed that the term could include virtually any crime involving moral turpitude. [1974] U.S.Code Cong. & Admin.News pp. 7093–96.

**13.** The Fifth Circuit has held that a prior conviction for petty theft is admissible under Rule 609(a)(2) as a crime involving dishonesty. *United States v. Carden,* 529 F.2d 443, 446 (5th Cir. 1976). The same conclusion was reached with respect to a prior armed robbery conviction in *United States v. Bianco,* 419 F.Supp. 507, 508–09 (E.D.Pa.1976), *aff'd,* 547 F.2d 1164 (3d Cir. 1977). See also *United States v. Dix-*

*on,* 547 F.2d 1079, 1082–84 (9th Cir. 1976) (robbery). Likewise, a number of state courts that have adopted Rule 609(a)(2) for use in their jurisdictions also have deemed prior convictions for theft or armed robbery admissible as crimes involving "dishonesty or false statement." *People v. Ray,* 36 Ill.App.3d 283, 343 N.E.2d 560, 562 (1st Dist. 1976) (misdemeanor theft); *People v. Dee,* 26 Ill.App.3d 691, 325 N.E.2d 336, 341–47 (1st Dist. 1975) (armed robbery); *People v. Stufflebean,* 24 Ill.App.3d 1065, 322 N.E.2d 488, 491 (5th Dist. 1974) (theft from person); *People v. Kreisa,* 24 Ill. App.3d 832, 321 N.E.2d 322, 324 (4th Dist. 1974) (misdemeanor theft); *Fletcher v. State,* 340 N.E.2d 771, 774–76 (Ind., 1976) (theft); *Webb v. State,* 259 Ind. 101, 284 N.E.2d 812, 814 n.1 (1971) (robbery).

The Second, Third and District of Columbia Circuits, however, have found prior theft and armed robbery convictions inadmissible under Rule 609(a)(2) as not involving crimes of dishonesty or false statement. *United States v. Hayes,* 553 F.2d 824, 827 (2d Cir. 1977) (dictum) (armed robbery, burglary and theft); *United States v. Smith,* 551 F.2d 348, 361–65 (D.C. Cir. 1976) (armed robbery); *Government of Virgin Islands v. Toto,* 529 F.2d 278, 280–82 (3d Cir. 1976) (petit larceny).

to steal reflects upon his honesty in a manner that bears adversely on his propensity to tell the truth.[14] Frankly, we are not anxious to enter the fray and, fortunately, are able to decide this case without having to rule on the general question of whether all crimes involving stealing necessarily involve "dishonesty" within the meaning of Rule 609(a)(2).

Even the courts that reject the view that stealing, without more, involves "dishonesty" that bears on a witness's veracity recognize that modern theft statutes may encompass criminal conduct that does fall within the ambit of Rule 609(a)(2), for a theft conviction may well be based on fraudulent or deceitful conduct that would previously have been prosecuted as larceny by trick, embezzlement, or the taking of money or property by false pretenses, etc. Accordingly, these courts have adopted the rule that, when the statutory offense of which the witness was convicted does not require proof of fraud or deceit as an essential element of the crime, the prior conviction may yet be admitted under Rule 609(a)(2) if the proponent of the evidence bears the burden of showing that the conviction "rested on facts warranting the dishonesty or false statement description." *United States v. Hayes,* 553 F.2d 824, 827 (2d Cir. 1977), quoting *United States v. Smith,* 551 F.2d 348, 364 n.28 (D.C. Cir. 1976); accord *Government of Virgin Islands v. Toto,* 529 F.2d 278, 281 n.3 (3d Cir. 1976). Such a showing was made in the case at bar.

In the course of a conference between counsel and the court outside the presence of the jury, the parties vigorously argued the question before us now. The Government took the position that Basile's theft conviction involved "dishonesty" within the meaning of Rule 609(a)(2) because theft was inherently a crime of deceit. Basile contended that only thefts perpetrated by means of some kind of deceit or false statement fell within the ambit of the Rule:

"He has to steal by slyness, by any type of deceit. Naturally, taking something is dishonest, but I think the [Conference Committee Report] indicates that it has to be some kind of vocal dishonesty."

The trial judge then inquired as to the nature of Basile's particular offense:

"I don't really know what theft from a savings and loan . . . means. Are we talking he went in and robbed them with a gun . . . ? Was he employed there and walked away with some money? I don't have enough facts . . ."

The Government replied:

"The original charge was forgery. That charge was plea bargained down to this particular charge. Some sort of false statement forgery in the application for a loan. That matter was then reduced and [he] plead guilty in this particular case to some sort of theft of under $100.00."[15]

On the basis of the Government's uncontested assertion that Basile's theft conviction rested on facts revealing fraud and

---

14. Indeed, "[a]ll acts of stealing are not the same." 3 *Weinstein's Evidence* ¶ 609[03], at 609–68 (1976). Larceny, for example, reflects adversely on the trustworthiness of a man's character and his testimonial credibility in a way that joyriding does not. Compare, e. g., *Gordon v. United States,* 127 U.S.App.D.C. 343, 383 F.2d 936, 940, *cert. denied,* 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1967), and *People v. Ray,* 36 Ill.App.3d 283, 343 N.E.2d 560, 562 (1st Dist. 1976), with *United States v. Carr,* 135 U.S.App.D.C. 348, 418 F.2d 1184, 1186 (1969), *cert. denied,* 396 U.S. 1030, 90 S.Ct. 590, 24 L.Ed.2d 525 (1970), and *Lewis v. State,* 157 Ind.App. 149, 151, 299 N.E.2d 193, 195 (1973). Moreover, with respect to the types of crimes that bear on a witness's veracity, one might also reasonably distinguish between theft and armed robbery. Theft is an act of stealth whose furtive character distinguishes it from armed robbery, an act of violence in which the perpetrator at least has the "decency" to let his victim know what he is about. Simply put, the pickpocket, unlike the armed robber, is a "sneak." Though the robber may be dishonest in the sense that he takes what does not belong to him, the pickpocket is both dishonest and deceitful in his dishonesty. Accordingly, a prior conviction for theft might reveal a man's propensity for deception and evasiveness that impeaches his testimonial credibility in a way that a prior armed robbery conviction would not.

15. In fact, Basile was originally indicted for a felony under 18 U.S.C. § 1014 as a result of having made false statements in an application for a loan from a federally insured savings and loan association. The indictment was subse-

deceit, the trial judge determined that Basile's prior conviction was admissible for purposes of impeachment.

Under the circumstances, we are convinced that Basile's particular crime involved "dishonesty or false statement" within the meaning of Rule 609(a)(2), even if those terms are narrowly construed as not including acts of stealing alone. Accordingly, without reaching the question of whether a theft conviction not predicated on fraudulent or deceitful conduct is admissible under Rule 609(a)(2), we hold that the fact of Basile's prior misdemeanor conviction was properly elicited from him on cross-examination at trial.

## VIII.

We turn last to Adonnis's argument that the district court erred in admitting evidence against him in rebuttal after he had rested without offering any evidence on his own behalf.

In rebuttal, the Government offered Mark Gary as a witness, who testified that he met with Adonnis and Papia the day after the indictment was filed in this case. According to Gary's testimony, Adonnis asked for Gary's opinion as to the strength of the case alleged against them in the indictment. Gary stated that he thought the Government had a case against them both, though a much stronger one against Adonnis than against Papia. Papia then said that something has to be done about Amidzich and Schmitz, two of the Government's leading witnesses. Adonnis explained to Gary that the source of the problem was that Amidzich had borrowed $5,000

from Papia to buy a car and then double crossed her by using it to open a rival business. Papia, explaining that "Adonnis told me that you g[o]t involved in things like this before," then told Gary that she would give him $5,000 to murder Amidzich and Schmitz. Gary asked for time to think about the proposition and said he would call Adonnis later that night.

Adonnis does not challenge the admissibility of the above testimony to show his consciousness of guilt. *United States v. Franks,* 511 F.2d 25, 36 (5th Cir.), *cert. denied,* 422 U.S. 1042, 1048, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975). Rather, he claims that the testimony was improperly admitted against him in rebuttal because he did not present any evidence in his own behalf.

We recognize that Adonnis's argument has some persuasive force. The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party. *United States v. Finis P. Ernest, Inc.,* 509 F.2d 1256, 1263 (7th Cir.), *cert. denied,* 423 U.S. 874, 893, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975). Where, as here, an adverse party rests without offering any evidence at all, there is, obviously, precious little in his case to rebut.

Nevertheless, even if we were to hold that Gary's testimony was technically improper rebuttal evidence as to Adonnis,[16] we need not thereby conclude that the trial court abused its discretion by permitting the Government to introduce it in the rebuttal portion of its case. *Cornes v. United States,* 119 F.2d 127, 130 (9th Cir. 1941); see

quently dismissed, and a superceding information charging misdemeanor theft under 18 U.S.C. § 2113(b) was filed. Basile plead guilty to that charge in December 1974 and was given a suspended sentence of one year's imprisonment in February 1975.

16. Given the wide latitude afforded trial judges in determining the proper scope of rebuttal evidence, as well as the question of whether proposed evidence is proper rebuttal, *United States v. Crowe,* 188 F.2d 209, 213 (7th Cir. 1951), we are not completely convinced that Gary's testimony necessarily must be deemed improper rebuttal simply because Adonnis presented no evidence on his own behalf. Other witnesses testified favorably to Adonnis, and

his counsel elicited on cross-examination of Papia that she never told Adonnis of her financial troubles with Amidzich, and that the "only" thing Adonnis had done for her in recent months was to drive her to the airport. The circumstances surrounding the alleged meeting of Adonnis, Papia and Gary, and statements that Adonnis was said to have made at the meeting, suggested a much closer relationship between Papia and Adonnis and tended to refute Adonnis's principal claim at trial that he had no knowledge of the Papia-Amidzich debt and that there was no evidence to show that, if he conspired at all, it was for the purpose of collecting the debt or punishing Amidzich for failure to pay it. Thus, Gary's testimony might

*Goldsby v. United States,* 160 U.S. 70, 74, 16 S.Ct. 216, 40 L.Ed. 343 (1895). The testimony was, after all, proper rebuttal as to Papia, who had testified that she never met with Gary and Addonis on the day the alleged conversation took place and never offered Gary a contract to murder Amidzich and Schmitz. Moreover, had the Government made a motion to reopen its case in chief against Addonis, the trial court would have been well within its discretionary authority in granting such a motion. *Rhyne v. United States,* 407 F.2d 657, 661 (7th Cir. 1969). The evidence being both relevant and admissible, we believe the trial court had authority in the interests of justice to admit it against Addonis during the Government's rebuttal, even if the evidence might have been more properly introduced in its case in chief, as long as the court's control of the order of proof worked no prejudice against him. *United States v. Montgomery,* 126 F.2d 151, 153 (3d Cir. 1942).

We fail to see how Addonis suffered any prejudice as a result of the order of proof adopted in this case. To be sure, the testimony itself was "prejudicial" in the sense that it was probative of Addonis's consciousness of guilt, and, by inference, of the fact of his guilt. This prejudice, however, was the product of the probative force of the evidence itself, not of the order in which it was admitted. The only prejudice that Addonis claims to have suffered from the timing of the evidence's admission was that he was "sandbagged" into resting his case without offering any witnesses on his own behalf. He says that he did not take the stand in surrebuttal to refute Gary's testimony for fear that the jury would interpret his action as panic at the new strength of the Government's bolstered case and as an admission that the unrefuted prior testimony of Schlechter and Holland, which he could not attack within the limitations of proper surrebuttal, was true.

Those problems, however, could have been easily cured by appropriate limiting instructions or a timely motion to reopen his case, a motion that the district court would no doubt have granted under the circumstances. Addonis was given substantial leeway on cross-examination to impeach Gary's credibility and, as Papia did, could have taken the stand and denied that Gary's testimony was true. We are convinced that Addonis had a full and fair opportunity to meet Gary's testimony and suffered no prejudice by reason of the timing of its introduction.

Moreover, even if the district court had abused its discretion in admitting this testimony against Addonis, we believe that, in the circumstances of this case, the error would have been harmless beyond a reasonable doubt in view of the overwhelming independent evidence of Addonis's guilt.

AFFIRMED.

---

conceivably be deemed proper rebuttal of evidence favorable to Addonis brought out on direct and cross-examination of other witnesses. See, e. g., *United States v. Johnson,* 502 F.2d 1373, 1374–76 (7th Cir. 1974), *cert. denied,* 420 U.S. 977, 95 S.Ct. 1402, 43 L.Ed.2d 657

(1975); *United States v. Hawk Wing,* 459 F.2d 428, 429–30 (8th Cir. 1972); *United States v. Hyde,* 448 F.2d 815, 846 (5th Cir. 1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972).